[Crim. No. 3397.   Second Appellate District, Division One.—December 17, 1940.]

THE PEOPLE, Respondent, v. JOSHUA LA FLEUR, Appellant.

Walter L. Gordon, Jr., for Appellant.

Earl Warren, Attorney-General, and R. S. McLaughlin, Deputy Attorney-General, for Respondent.

YORK, P. J.—In an information filed by the district attorney of Los Angeles County, appellant was charged with the crime of murder. Upon his arraignment he moved for a dismissal under section 995 of the Penal Code which motion was denied, whereupon he entered his plea of "not guilty" and personally waived trial by jury. After hearing the evidence, the court found him guilty of murder of the first degree. This appeal is prosecuted from the judgment of conviction, as well as from the order by which his motion for a new trial was denied.

It is here urged that the evidence is insufficient to sustain the judgment for the reasons that:

1. Appellant produced certain evidence to show that the act was committed by him in self-defense, which was neither rebutted nor refuted.

2. The record is absolutely devoid of any evidence which would tend to show that the killing was a wilful, deliberate and premeditated killing with malice aforethought. Under no theory known to the law is the evidence in this case sufficient to support a first degree murder conviction.

About 9 o'clock on Saturday night, May 4, 1940, several men, including appellant, Rufus Eckford (the deceased), T. L. McGowan and Oscar Pugh, were playing a crap game in a welding shed at the rear of Leon's Garage on Central Avenue in the city of Los Angeles. Just prior to the altercation which resulted in the fatal stabbing of Rufus Eckford, he was shooting the dice. He hit five straight naturals, five deuce sevens, at $1.05, and when he hit the fourth deuce seven, ap-

pellant turned to McGowan and said, ''I am going to catch these dice to look at them.'' By that time Eckford had thrown the fifth deuce seven, whereupon appellant jumped on the table and grabbed the dice, turned them back and forth in his hand and said, ''These are not the dice we were shooting before'' (referring to a game that had been played earlier in the evening on East 49th Street at which time appellant had lost $3.60 and had marked a set of dice which was then being used). Appellant then turned to Eckford and said, ''Come here, I want to talk to you''; and both men walked over to a corner in the west end of the welding shop and began to talk. According to the witness McGowan, the two men conversed in a low tone of voice and could not be heard until Eckford said to appellant, ''You talk like a damned fool . . . you can take it out of my hide.'' McGowan then walked over to them and found appellant ''was standing with his back to the wall with his hands in front of him, and Mr. Eckford was standing right here in front of him . . . I said 'What is the matter', and LaFleur said, 'Mr. Eckford won my money . . . I asked him for my money back, and he will not give it back to me', and I said to Mr. Eckford, . . . 'If he caught you fair, give him his money, don't wake up the rest of the people'. . . . Mr. Eckford said, 'That man talks like a fool', and . . . LaFleur pulled off his eye glasses and he said (addressing McGowan) 'Hold my eye glasses'.'' Appellant then turned to Eckford and said, ''If you will put.up that knife, I will whip you'', to which Eckford replied, ''You can get that out of my hide the best way you can.''

McGowan's version upon cross-examination of what occurred from that point is as follows: ''When he said that Mr. Eckford made at LaFleur with the knife and I jumped in between . . . I shoved Mr. Eckford back . . . I would say about a foot or a foot and a half. . . . Q. And he struck over your shoulder at LaFleur a foot and a half in the rear of you? A. Yes. Q. Then what happened? . . . A. When LaFleur broke out from behind me, Mr. Eckford met him on the opposite side. Q. LaFleur was down here, and Eckford was north of him, farther away from the door then LaFleur was? A. Mr. Eckford was back in here and Mr. LaFleur was back here and I was between them. . . . LeFleur tried to go around to the right of me and Mr. Eckford cut by him on that side . . . Mr. Eckford struck at LaFleur with the pocket knife. Q. How many times did he strike him? A.

When he got out on this side of me he struck at him once. Q. That was the only time that he did strike at him? A. No, sir, he struck at him over my shoulder the first time. Q. Then he struck at him twice? A. Yes. Q. And then La-Fleur only struck at Eckford twice? A. No, I said Mr. Eckford struck at Mr. LaFleur twice. Q. How many times did Mr. LaFleur strike Mr. Eckford? A. To my estimation, four or five times. Q. Where was Mr. Eckford standing when he struck at Mr. LaFleur? A. He was in right in front of me. Q. And Mr. LaFleur was in back of you? A. Yes. Q. And Mr. LaFleur also struck over you at Mr. Eckford? A. Yes. Q. You were in between these men that were slashing each other with knives. A. Yes. Q. How many cuts did you get? A. Only one. . . . They cut at each other four or five times . . . when Mr. Eckford broke around and started around, LaFleur started out behind me to the right, and Mr. Eckford cut him off and LaFleur comes hitting over my shoulder like that, and Mr. Eckford backs up . . . La-Fleur reached around and ran from here back here, over here in this place. Q. For the purpose of the record, he ran from the north by the partition to the west side of the welding shed over to the northeasterly corner of the welding shed, is that right? A. Yes . . . And then LaFleur backed out by this man and Mr. Eckford was standing along here with his hand like this, and LaFleur was standing over about here, and I told LaFleur to put his knife away, and LaFleur said, 'I am not going to put my knife down until that man gets out of here and goes out of here', and Mr. Eckford turned around and faces LaFleur, and Mr. Eckford comes up to the door, and when he gets to the door he fell up against the door, and he walks on out between the cars and leaned up on the fender of the Ford V–8. Q. How long would you say that Mr. Eckford and Mr. LeFleur were engaged in this knife fight? A. I would say two or three minutes.''

Eckford apparently collapsed near the said Ford V–8 where he was found lying in a pool of blood with his clothing torn and disarranged, and the right front pocket of his trousers turned outside. The autopsy surgeon testified that his examination showed five clean cut stab wounds: (a) One 1½ inches long on the left shoulder; (b) one five-eighths inches long which entered the chest wall just below the left arm pit; (c) a cut five-eighths inches long which en-

tered the upper left side of the back over the scapula and penetrated in depth to this bone; (d) a wound which penetrated the lobe of the left ear and could be considered as continuing to create wound (e), a clean cut, five-eighths inches long "entering the neck below and back of the lobe of the left ear, and following a course to the right in a horizontal plane, penetrated two and one-half inches to reach and enter the spine and spinal cord, having passed between the second and third cervical vertebrae. . . . Chemical analysis of the blood showed 0.29 per cent alcohol. . . . the prime cause of death was stab wounds of the cervical spine and cord. . . . His death must have been practically instantaneous. . . . a collapse would take place due to motor paralysis, and the hemorrhage in the cord at the base of the brain would lead to unconsciousness or death within a period of a very few minutes".

Appellant took the stand in his own defense and his version of the affray from the time the witness McGowan joined him and decedent was as follows: McGowan "came over and asked me what was the matter, and I explained the matters to him, and in about an instant he (Eckford) cut at me, and cut my sweater on the shoulder, and about that time McGowan was trying to talk to him and tell him about being crooked, and I was up against the wall, and I said to McGowan, 'I am trying to get out of here', and I kind of gave him a soft punch, that was all I did, and he came back in turn, and about that instant . . . I reached in my pocket and got my knife, and in my own defense, and McGowan said 'He cut me', and we started to swinging at each other, and all I remember, he put his hand on his neck and about that time he cut at me again, and I ducked out of his way and swung at him again, and the last time I swung at him I got him to stop and he acted like he was crazy or something, and McGowan then said, 'Why don't you stop fighting?' I said 'I can't stop this fellow from cutting me, why don't you catch and hold him, or do something with him?' He acted like he was crazy and about that instant he stopped and he kept holding his hand on his neck, and I didn't even bother him, and he stood up looking at me, and in the meantime everybody was cleared out of the place, and he went outside and McGowan said, 'Come out here, he is not out here,' I peeked out of the door and I didn't see him, and I went on out, and I called to Violet Shaw (a friend of appellant,

whose house faced on the alley near the welding shop) . . . 'I got into some trouble, and I will call you later.' I went down to the drug store and called the ambulance''; that the next day McGowan told him that Eckford was dead, whereupon appellant gave himself up to the authorities.

Mrs. Arzilia Nelson, a witness for the prosecution, gave an entirely different version of the affray, to the following effect: She testified that she was in the kitchen of her home between the hours of 8:00 and 9:30 in the evening of May 4, 1940, when she heard loud talking outside; that she looked out of her kitchen window and observed two men close to the alley in the vacant space at the rear of Leon's Garage; that they were both talking and moving, one with his hands raised was moving backward toward the alley, and the other man was moving toward him at the same time saying, "Give me the money". When they reached the third window of the Shaw house directly across the alley from the witness' house, "They were both talking and one man kept saying, 'Give me my money', and the other man says, 'I haven't got your money, I have not got your money, I have not got it, I ain't got your money', and the other man said, 'You give me my money', and then I heard the man with his back to the window at that time, he says, 'I ain't got your money', and then he says, 'Oh, I am stabbed in my heart, somebody stop him', and at that time this other man said, 'I will kill you about my money', and then he says . . . the man with his hands up, 'I ain't got your money, I ain't got your money, I ain't got your money.' He said that three times, after he said he was stabbed.'' In reply to the question, "Did you see the man who was facing the man with his hands up, did you see any motion on his part?, the witness Nelson stated: "I saw one motion just before the man said that he was stabbed. I saw one motion. I didn't see it, which one made it, but there was one motion in the shadows. You see they were in the dark of the house. Q. What was that motion? A. It seemed like it was a strike. . . . Mr. Wildey: For the purpose of the record, bringing the arm slightly forward and downward. Q. Was that with the right or left hand? A. It seemed like it was the right. Q. With the right hand? A. Yes.''

The witness then testified that she ran from the kitchen window to a window in her living room where she observed one man had backed up against the house with his hands still in the air and the other man "was placing his hands both

inside and under the coat'' of the first man. The two men then walked back into the vacant lot near some cars that were parked there, and ''one of the men turned and went behind the cars, and then the other man stood peeking from the cars behind him. After the man stood in the alley, and he went down in the dark part, and then a car came up, and— . . . the other man that was standing there, he went down in the dark and then I could not see him.'' This witness also testified that one of these two men walked down the alley and got in a car; that he later returned and went to the third window of the Shaw house and said, ''I have cut a man, and I will let you know where I am.''

Officer Broady testified that he arrived at the scene of the homicide at about 9:40 P. M., that he found deceased lying in a pool of blood near a car in the vacant lot; that there was a trail of blood from where deceased lay to a point in the alley under one of the windows of Mrs. Shaw's house; that there was another stream of blood from there back down the alley to the parked cars and then it turned and went just inside the door of the welding shop; that when he examined deceased, he saw that his right front pocket was turned out about three-fourths of the way.

Appellant contends that the fatal blow was struck in the welding shed and that decedent was the aggressor. Respondent urges that the fatal blow was struck by appellant in the vacant lot where deceased was later found, and that appellant was the aggressor.

■ The ''fact that an unlawful killing by the defendant may have been established, and in that connection that assumed 'circumstances of mitigation' have been placed in evidence either by the prosecution or by the defendant, as far as the jury is concerned, they are not necessarily conclusive either as to the proof of the several items of evidence by which such 'circumstances of mitigation' have been sought to be established, or as to the effects of such items taken either separately or as a whole. ■ The jury (or the court sitting without a jury) has the right, and it is its duty, to weigh such evidence and thereupon to determine what credit, if any, it deserves, and thereupon to accord to it the weight to which it is entitled. And in so doing, should the jury conclude that the 'circumstances of mitigation' either have not been satisfactorily established by credible evidence, or that even if isolated respective facts should have been satisfactorily es-

tablished, their combined weight has failed to prove an ultimate fact which amounts to legal mitigation of the offense,—as a matter of additional prerogative, the jury has the right to reject the whole of such evidence and thereupon and thereafter to revert to the respective remaining questions, if any, which may relate to the two degrees of murder, together with the incidental question of recommendation of punishment, should first degree murder be the verdict. ■ In other words, an issue either as to whether 'circumstances of mitigation' have been proved to have existed at the time when the offense was committed, or whether in the language of section 189, Penal Code, the killing was the 'wilful, deliberate and premeditated' act of the defendant, depends for its determination primarily upon the evidence that may have been presented in its favor, as well as that which may have been received against it; and in reaching a conclusion with reference to the matter, in the consideration of all the evidence, the jury should be guided by rules that relate to other 'defenses' generally. . . . 'It is left to the jury to say whether the evidence is sufficient to lead them to believe or to entertain a reasonable doubt whether the offense was committed under heat of passion . . . the sufficiency of provocation to reduce a homicide from murder to manslaughter, and whether defendant did in fact act under such provocation, are questions of fact for the jury. . . . Sound policy declares that the issue of guilt or innocence is for the jury's determination, and that appellate courts should interfere with judgments of conviction only in exceptional cases.' '' (*People* v. *Wells*, 10 Cal. (2d) 610, 620 et seq. [76 Pac. (2d) 493].)

■ Appellant admitted the killing, consequently, considering the state of the record and the evidence which is hereinbefore narrated, the issue of mitigation or self-defense, as well as the degree of the crime became questions of fact for the determination of the trial court.

■ The evidence adduced at the trial of the instant cause was absolutely sufficient to justify a verdict of second degree murder, but it was hardly sufficient to support a verdict of murder of the first degree, when reviewed in the light of all the surrounding circumstances shown by the record, and taking into consideration the decisions of the Supreme Court in the cases of *People* v. *Howard*, 211 Cal. 322 [295 Pac. 333, 71 A. L. R. 1385], and *People* v. *Kelley*, 208 Cal. 387 [281 Pac. 609].

The judgment of the lower court of murder of the first degree is modified. The cause is remanded to the trial court with directions to enter a judgment against appellant finding him guilty of murder of the second degree, and to thereupon pronounce judgment against him as prescribed by law.

Doran, J., and White, J., concurred.