[Crim. No. 1872. Third Dist. Aug. 31, 1944.]

THE PEOPLE, Respondent, v. JAMES WILSON DANIEL, Appellant.

Sinclair M. Dobbins for Appellant.

Robert W. Kenny, Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

ADAMS, P. J.—In an information filed in Solano County appellant was charged with the murder of one Bert McCloud. He entered pleas of not guilty, and not guilty by reason of insanity, was found guilty of murder of the first degree with imprisonment for life, and thereafter withdrew his plea of not guilty by reason of insanity. He then moved for a new trial which motion was denied. This appeal followed.

In this court appellant states that in the lower court, on his motion for a new trial, he urged that the evidence did not show him guilty of the degree of crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein; and he asks that this court modify the judgment by reducing it to manslaughter, pursuant to section 1181, subdivision 6, of the Penal Code. In short, the commission of the homicide is admitted, but it is urged that

the mental condition of defendant at the time of the commission of the offense, due to intoxication and the effects of a drug which he had taken, was such that he was incapable of entertaining the purpose, intent or malice that are essential elements of the crime of murder of the first degree, and that the evidence shows that he did not, in fact, entertain such purpose, intent or malice. No errors during the course of the trial are assigned.

At the trial the appellant testified that he was a native of Texas aged twenty-nine years; that he had had two years in high school; that he was a construction worker by trade, but had left that work and had been driving a taxicab for about six months; that he had been a heavy drinker, consuming not less than a quart of whisky a day for the previous year and a half; also that he was afflicted with syphilis and for that reason had been rejected for military service; that in the afternoon of the day before the homicide he had consulted a Dr. Carlson, seeking relief from the alcohol habit; that this doctor had prescribed benzedrine sulphate tablets to be taken one only each day after breakfast; that he had partaken of numerous drinks of liquor during the afternoon preceding the killing, and also had taken not one, but three of the benzedrine sulphate tablets; and that he had no recollection of the circumstances surrounding the homicide.

Other testimony shows without conflict that during the afternoon preceding the homicide defendant had been drinking heavily. He had purchased a revolver a few days before, at which time he had registered it at the police station. About 6:00 o'clock he went to his room and got the gun to show to a friend to whom he sought to sell it. The prospective sale failed and he put the gun into his pocket. About 11:00 o'clock that evening he entered a place known as the Rex Café where he participated in a poker game for about twenty minutes, and won $4.25. He went to McCloud, the cashier, to cash in his poker chips, and went out. A few minutes later he again entered and went to the cashier's desk where he had some conversation with McCloud, apparently claiming that he had not been paid the full value of the chips previously cashed, though the conversation was in a low tone, and was not fully overheard. McCloud was heard to say, "Go home, son, go to sleep, you come back tomorrow, you feel better," to which defendant replied "You win," and again went out. Defen-

dant then proceeded to another barroom where, shortly before midnight, he asked for whisky but he was refused more liquor because the bartender who had seen defendant drink half a highball glass of whisky about 5:00 o'clock thought he had enough. This bartender described defendant as being very drunk, glassy-eyed and "sort of dazed," and stated that he advised defendant to go and get some coffee, saying that later they would have dinner and go home; that thereupon appellant asked this bartender to buy the gun but the bartender replied that he had no use for it. Appellant then left and returned to the Rex Café where he walked to a chair in which McCloud was then seated at a card table participating in a poker game. Defendant leaned forward and spoke into the victim's ear, apparently again asking for his money as McCloud was heard to tell him he had got all his money. Appellant then stepped back, pulled the gun from within the front of his shirt and fired a shot. The testimony of the autopsy surgeon called by the prosecution is, we think, very significant. He testified that he examined the body of deceased in the presence of three other persons, including police officer Morris; that "a bullet wound entered the right side, below the hip, traveled upwards and across the center line of the body. The bullet was found imbedded in the second lumbar vertebra"; that the course of the bullet was *upward and inward* towards the center of the body. On cross-examination he stated:

"Q. Could you tell from your examination of the wound, in probing it, whether the bullet had deflected in any way from its original course after it had entered the body?

"A. No, I would say it was a straight course.

"Q. It took a straight course, without any deflection. Did the bullet strike any bones in the body that would deflect its course?

"A. When it penetrated the hip, that is, the right ilium, that is a portion of the pelvis bone.

"Q. That bone is a very light bone? A. Very thin bone.

"Q. A very thin bone, and in your opinion not sufficient to deflect the course of the bullet as it was immediately going through it? A. Yes. . . .

"Q. Assuming that the body of McCloud was in a vertical position, or either standing or sitting, from the course of the

bullet as you saw it in the body, isn't it true that the gun firing that bullet would have had to have been at a lower level than the point of entry of the bullet?

"A. Yes, sir.

"Q. That is correct, is it not? A. Yes.

"Q. Could you tell, when you examined the bullet, Doctor, whether or not that bullet had struck some object prior to its entry into the body?

"THE COURT: You may answer that 'Yes' or 'No.'

"A. No. . . .

"MR. DOBBINS: Q. At least you said, Doctor, upon the passage of the bullet through the ilium, in the pelvic cavity, it severed a vein; is that correct? A. Yes, sir.

"Q. And in severing this vein caused a hemorrhage?

"A. Yes.

"Q. Which eventually completely filled the pelvic cavity?

"A. Yes. . . .

"Q. Then, the severing of this vein by the bullet was the actual cause of death, was it not?

"A. Yes, sir. . . .

"MR. DOBBINS: Q. And where did you say the point of entry was, again, Doctor, about where your thumb is? A. Yes. (Indicating.) There is the tip of the hip.

"Q. And it was below the tip of the hip? A. Yes.

"Q. And it took a course back and upward? A. Yes.

"MR. DOBBINS: Q. I want to ask you this, Doctor, assuming that this bullet had entered the right side of the body of McCloud, and pursued a like course, and had not severed this vein, would such a wound have been necessarily fatal?

"A. No, sir."

After firing the shot defendant backed across the room some fifteen feet and ordered all persons present to stand back and keep away from him. He fired a second shot into the floor, then handed, or attempted to hand, the gun to an acquaintance who was present, stating "Tommy, I won't shoot." At this point two officers arrived and took appellant into custody.

The evidence as to defendant's condition prior to and at the time of the shooting is conflicting. Defendant himself testified that he had had several drinks that day—"double shots" of whisky; that he had no recollection of events subse-

quent to 6:30 or 7:00 o'clock in the evening. One witness. who had taken defendant the previous day to Dr. Carlson to secure advice and assistance to cure his drinking habit, testified that he saw defendant between 4:00 and 5:00 p.m. at which time he appeared to be "hopped up"; that he was pasty-faced and his eyes were glassy; that he again saw defendant about midnight in the Rex Café, when his appearance was about the same or worse. Another witness to whom defendant had attempted to sell the gun about 6:00 p.m. said that defendant was then nervous and did not appear as he usually did when he was drinking; that they had a drink together. The bartender to whom defendant tried to sell the gun just before the shooting said that he had known defendant for about two years, that he was a very heavy drinker, consuming a quart or two of liquor each day, but that he never staggered when drunk; that when defendant came to his bar about midnight he was "pretty shaky," and walked around like he was in a dream; that he was "wild-eyed," and had a blank expression; that he appeared to be "awful drunk." One witness, present at the time of the shooting, said defendant appeared "pretty mad"; another said he did not know whether defendant was drunk or not, though at the preliminary hearing he had said that defendant "Looked like drunk." Another witness stated that defendant was very calm and not excited—that he looked scared. Another said defendant did not appear drunk but was pasty-faced, his eyes were glassy and his expression blank—that he did not appear angry. Another witness said that, not knowing, he would say that defendant was sober; that if he was under the influence of liquor he did not show it. Another witness said that defendant was "nervous." The chief of police who interviewed defendant about 2:00 o'clock a.m. after the shooting stated that in his opinion defendant was "perfectly sober," though he did not give him a sobriety test. Dr. Brownlee, who gave defendant an examination about 1:30 or 2:00 a.m. expressed the opinion that defendant was sober. The two officers who arrested defendant were called as witnesses but were not asked about defendant's condition.

Dr. Carlson, called as a witness for defendant, testified that defendant had called upon him the day before the shooting, seeking a cure for his drinking habits; that he examined

defendant and found evidences of alcoholism, and had outlined a form of treatment which included the taking of benzedrine sulphate for which he gave defendant a prescription. He said that assuming that defendant had consumed considerable alcohol on the day of the homicide and had taken also the number of benzedrine tablets which were missing from defendant's box, in his opinion defendant would have suffered definite mental and physical disturbances which might have resulted in a period of amnesia. In response to a hypothetical question he stated that he believed that defendant at the time of the shooting was "wholly incapacitated," and did not have sufficient mental capacity to formulate an intent to kill; that the picture was one of a man who was amnesiac from alcohol, who did not remember what he did, was irresponsible for his acts, and could not deliberate at all. He stated also that if defendant had taken all of the tablets indicated he would have taken sixteen times the prescribed dose, as each tablet consisted of four parts, only one of which was to be taken daily.

Dr. Joseph Catton, also called as a witness for the defense, testified that he had passed upon defendant's papers when he passed through the Induction Center in July, and had listed him as a "constitutional psycopath" with a history of chronic alcoholism and syphilis; that on an examination about a month prior to the trial he had formed a similar opinion of him. He also testified that under certain circumstances benzedrine sulphate will cause coma, amnesia, homicidal traits and periods of complete collapse; and in response to a hypothetical question which assumed that defendant had consumed considerable alcohol and had taken at least three of the benzedrine tablets within a period of a few hours, he stated that "a man could do nothing other than have his mental capacity seriously affected by such combination of toxic substances"; that consciousness, in the sense of awareness of his acts, would be seriously interfered with, and he could not be considered as thoroughly conscious of what he was doing—that he did not have sufficient capacity to appreciate fully what he was doing.

The prosecution called three experts, who had examined defendant prior to the trial. They testified variously, in response to a hypothetical question which incorporated the facts substantially as hereinbefore stated, that defendant at the time of the homicide "had reasonable use of consciousness"

though there might be some doubt as to whether he remembered it; that he "was conscious" though there might have been a certain amount of impairment of consciousness—a "disturbed consciousness"; that "he had consciousness" though "I should doubt he had full consciousness, that he was very much under the influence of alcohol"—that there was "a certain disturbance of consciousness"; that benzedrine might produce a transitory delirium, that it is a "tricky drug" and might have the effect of "stepping up" the alcohol.

There is no evidence that defendant knew or had ever seen McCloud prior to the night of the homicide, or that he had any reason or motive for the killing other than may be inferred from the act itself and the events immediately preceding it; and it is urged by appellant that the evidence fails to show malice, premeditation or an intent to kill before or at the time defendant fired the shot; that the degree of the crime should, therefore, be reduced to manslaughter. Reliance is had upon *People* v. *Kelley,* 208 Cal. 387 [281 P. 609], *People* v. *La Fleur,* 42 Cal.App.2d 50 [108 P.2d 99], *People* v. *Castro,* 37 Cal.App.2d 311 [99 P.2d 374], *People* v. *Golembiewski,* 25 Cal.App.2d 115 [76 P.2d 717], and similar cases.

In *People* v. *Kelley, supra,* the court said that if on appeal the court "finds the evidence insufficient to justify the conviction for the crime alleged in the indictment, but sufficient to justify the conviction of a lesser degree of the crime or of some lesser and included crime," it need not set aside the verdict entirely, but may direct a modification of the judgment without ordering a new trial, and remand the cause to the trial court for the sole purpose of enabling that court to prescribe the proper penalty in punishment for the crime the appellate court finds to have been committed. And it further said that while in that case the injuries inflicted upon deceased were bestial and shocking, there was nothing in the record from which it might, with reason, be argued that they were inflicted with that intent or that malice aforethought which is a necessary ingredient of the crime of murder, adding "Nor can we bring ourselves to believe that there was a wilful, deliberate and premeditated killing"; that "no express malice was shown, for there was not manifested a deliberate, or any, intention to unlawfully take the life of a fellow creature, and the circumstances attending the killing in this case, as proved, do not show an abandoned and malignant heart." The degree

of the crime was reduced from murder of the first degree without recommendation, to manslaughter.

In *People* v. *Howard,* 211 Cal. 322 [295 P. 333, 71 A.L.R. 1385], as in the Kelley case, defendant was convicted of murder of the first degree without recommendation, and a motion in the lower court for reduction of sentence was denied. It was not contended on appeal that defendant had not killed deceased, who had been struck with a hammer while lying down on his bed; but it was urged that the evidence did not show the degree of crime found. The court said, p. 329:

"To be murder of the first degree, under our statute, the killing must be premeditated, except when done in the perpetration of certain felonies; that is to say, the unlawful killing must be accompanied with a deliberate and clear intent to take life. If the act be preceded by, and be the result of a concurrence of will, deliberation and intent, the crime of first degree murder is proved. (*People* v. *Bellon,* 180 Cal. 706 [182 P. 420].) When the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree. (*People* v. *Knapp,* 71 Cal. 1, 6 [11 P. 793]; *People* v. *Ford,* 85 Cal. App. 258, 263 [258 P. 1111].)"

It then said that there was no evidence from which it might reasonably be deduced that the killing was the result of a wilful, deliberate and premeditated intent to kill; that "We entertain a doubt as to its showing murder of the first degree." Accordingly, the judgment of the lower court was modified to murder of the second degree.

In *People* v. *Castro, supra,* defendant was also convicted of murder of the first degree, the victim being his wife who was slain with a knife during a quarrel. After the killing defendant fled and was apprehended some eleven days later. The wife on her deathbed implicated the defendant, and there was some testimony that the parties had on previous occasions quarreled and defendant had struck his wife. However, the court on appeal said, page 315:

"While the record reveals that there had been some arguments or quarrels between appellant and decedent, it was shown by the testimony of the landlady of the apartment house where this couple lived that she had never heard them

quarrel. Taken as a whole, the evidence presented falls short of the modicum required for a conviction of murder of the first degree, in that it fails to show that the injuries which decedent suffered were inflicted by appellant 'with that intent or that malice aforethought which is a necessary ingredient of the crime of murder'. (*People* v. *Kelley,* 208 Cal. 387, 393 [281 P. 609].) The attending circumstances neither indicate an abandoned and malignant heart on the part of appellant, nor portray a wilful, deliberate or premeditated killing, but reveal a crime committed 'upon a sudden quarrel or heat of passion', i. e., voluntary manslaughter. (Sec. 192, Pen. Code.)''

In *People* v. *La Fleur, supra,* defendant was convicted of murder of the first degree. The homicide was committed after defendant and decedent, with others, had been shooting dice, during which game defendant accused decedent of using loaded dice and demanded the return by decedent of money which he had won from defendant. The court said, page 57: ''Appellant admitted the killing, consequently, considering the state of the record and the evidence which is hereinbefore narrated, the issue of mitigation or self-defense, as well as the degree of the crime became questions of fact for the determination of the trial court.'' But it concluded that, while the evidence was ''absolutely sufficient'' to justify a verdict of second degree murder it was hardly sufficient to support a verdict of murder of the first degree, ''when reviewed in the light of all the surrounding circumstances shown by the record,'' and taking into consideration the decisions of the Supreme Court in the cases of *People* v. *Howard, supra,* and *People* v. *Kelley, supra.*

In *People* v. *Cowan,* 38 Cal.App.2d 231 [101 P.2d 125, 135], defendants were convicted of murder of the first degree with life imprisonment. The killing grew out of a controversy over control of prices and practices in the dyeing and cleaning business in Los Angeles, defendants being engaged in acts of sabotage in an effort to keep the various firms engaged in the business ''in line.'' The victim of the homicide was one Stockton employed by one firm as janitor and night watchman. The murder was committed in the course of a conspiracy between the defendants and others. The evidence as to the actual killing was circumstantial. The court said, page 248:

"In our study of the record we have failed to find satisfactory evidence of premeditation in the killing to support the verdicts and judgments of murder of the first degree. (Sec. 189, Pen. Code.) The circumstances surrounding the actual act of killing are undisclosed. We know that it was not 'committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem.' (Sec. 189, Pen. Code.) Defendants should have been found guilty of murder of the second degree. This 'injustice may now be righted without subjecting the state and the defendant(s) to the delay and expense of a new trial.' (*People* v. *Kelley*, 208 Cal. 387 [281 P. 609].)''

In *People* v. *Slater*, 60 Cal.App.2d 358 [140 P.2d 846], defendant was found guilty of second degree murder. The appellate court reduced the crime to manslaughter, saying, page 371:

"In the present case, as stated, the evidence is legally sufficient to establish an unlawful killing; but after viewing the case in the light of all the surrounding circumstances as they are shown by the evidence, and especially taking into consideration the fact that the fatal shooting occurred during a heated verbal altercation which started after the deceased went up the back stairs and pounded on appellant's door with a broom handle and shouted to her to come out; also appellant's age and the fact that she was suffering from a chronic heart ailment and the effects thereof, *we are not satisfied* that the evidence establishes any greater degree of crime than manslaughter. As stated in 13 Cal.Jur. 609, 'When a mortal blow is struck upon a sudden quarrel or in the heat of passion, upon adequate provocation, the actual intent is disregarded. In such case, although the intent to kill may exist, it is not that malicious intent which is an essential element in the crime of murder.' And applying that doctrine to the present situation, we are not prepared to hold as a matter of law that this is not such a case.'' (Italics ours.)

In some respects the evidence in that case is comparable to the evidence in the case before us.

In *People* v. *Golembiewski, supra,* appellant was convicted of first degree burglary. He sought reduction of the degree of the crime to second degree burglary under section 1097 of the Penal Code. The question was whether the evidence

showed the crime to have been committed in the nighttime or in the daytime. The court said, pages 118-119:

"It is the rule that where evidence is open to two equally reasonable constructions, one of which points to the guilt of the defendant of a higher degree of a crime, and the other to his guilt only of a lesser degree thereof, *the court must adopt that theory pointing to guilt of the lesser degree.* In the case before us the evidence indicates that the victim of the burglary . . . retired and slept from 1:00 to 9:00 o'clock on the morning of the crime. There being no evidence either direct or circumstantial to indicate that the crime was committed in the nighttime or that the defendant was armed, or assaulted anyone, while there is evidence to indicate that it might well have been committed between daylight and 9:00 A.M. of the morning in question, the court was bound to resolve that doubt as to the degree of the crime in favor of the accused and to find him guilty of burglary of the lesser or second degree. That the crime of burglary as charged . . . was committed and that the appellant committed it, are firmly established by this record. No miscarriage of justice, therefore, resulted, except that, as a matter of law, the court improperly fixed the degree of the crime and imposed the penalty therefor. That injustice may now be righted by this court without subjecting the state and the defendant to the delay and expense of a new trial. (*People* v. *Kelley,* 208 Cal. 387, 393 [281 P. 609]; sec. 1181, subd. 6, Pen. Code.)" (Italics ours.)

From the foregoing it is deducible that under the provisions of section 1181, subdivision 6, of the Penal Code, an appellate court, "if it finds the evidence insufficient to justify the conviction for the crime alleged" (*People* v. *Kelley, supra*); or if it *"entertains a doubt"* that the evidence shows the degree of the crime of which a defendant has been found guilty (*People* v. *Howard, supra*); or, if, when viewed in the light of all the surrounding circumstances, the evidence is "hardly sufficient" to support the degree of the crime found (*People* v. *La Fleur, supra*); or, if it fails to "find satisfactory evidence of premeditation" to support a verdict and judgment of murder of the first degree (*People* v. *Cowan, supra*); or where it "is not satisfied" that the evidence establishes the degree of crime and is "not prepared to hold

as a matter of law'' that there existed the malicious intent which is an essential element of the crime of murder (*People* v: *Slater, supra*) ; or, ''where evidence is open to two equally reasonable constructions, one of which points to the guilt of the defendant of a higher degree of a crime, and the other to his guilt only of a lesser degree thereof'' (*People* v. *Golembiewski, supra*), such court shall resolve doubts in favor of the accused and reduce the degree of the crime accordingly.

■ Respondent argues that where a substantial conflict in the evidence exists the finding of a jury as to the degree of an offense is binding upon an appellate court. (Citing *People* v. *Newland,* 15 Cal.2d 678, 681-682 [104 P.2d 778] ; *People* v. *Stark,* 16 Cal.App.2d 467, 468-469 [60 P.2d 595] ; and *People* v. *Tedesco,* 1 Cal.2d 211, 219 [34 P.2d 467].) But in the cases cited the power of the appellate court to reduce the degree of the crime was not under consideration. Reversals were sought therein, and the reviewing courts applied the well established principle that where there is substantial evidence of the guilt of a defendant an appellate court will not *reverse* a judgment on the ground that it is not sustained by the evidence.

Respondent also argues that intoxication is no defense to the commission of crime ; that it may be considered only as bearing upon the ability of an appellant to form a specific intent to kill (Pen. Code, § 22) ; and that the question whether defendant was intoxicated to such a degree that he could not form such specific intent was one of fact for the jury. Respondent asserts that the failure of decedent in this case to meet the demands of defendant regarding the amount of his winnings ''aroused his resentment and anger and furnished the motive for the killing''; that the fact that defendant was able to win at poker ''shows a control of mental faculties of no mean order''; that defendant's words and actions after the shooting ''to secure his own safety'' showed good judgment and reflection; that his conduct showed him to be in full control of his mental faculties, conscious and able to form the requisite intent to commit the homicide; that the testimony of the experts as to whether defendant was conscious or unconscious of his acts was conflicting and therefore the finding of the jury thereon is binding upon this court. It concludes that the appeal is without merit,

and that the judgment and order denying a new trial should be affirmed. Respondent does not, however, give particular consideration to the only question before us, to wit, whether the degree of the crime should be reduced; not necessarily whether defendant was conscious or unconscious of his acts, but whether the evidence justifies the conclusion that the homicide was committed with that intent or malice aforethought which is a necessary ingredient of the crime of murder.

After a careful review of the record we are of the opinion that it fails to show satisfactory evidence of premeditation to support the verdict and judgment of murder of the first degree. That defendant had been drinking heavily before the homicide, and that he had taken an excessive amount of a drug that may well have and probably did impair his reasoning faculties is uncontradicted. There is no evidence that defendant had any prior acquaintance with deceased, bore him any ill will or had made any threats to take his life. Defendant's possession of the gun was not acquired for the purpose of injuring deceased, and his efforts to sell it to the barkeeper immediately prior to the shooting indicates that at that time defendant entertained no thought of using it for revenge against deceased. His manner of insisting that he had not received from McCloud the full value of the chips cashed in was not threatening nor that of one angered, but evidences rather the characteristic persistence of an inebriate. And while voluntary intoxication is not an excuse for crime it is proper to be considered in arriving at a conclusion as to the intent and premeditation with which a crime is committed. (Pen. Code, § 22.) In addition to the foregoing we are impressed with the uncontradicted testimony of the autopsy surgeon, which compels a conclusion that the shot fired by defendant was not fired directly at deceased but must have struck some obstacle which deflected its course and caused it to enter the body of decedent. It entered his body below the coxa while deceased, who was a short man, was seated, and defendant was standing erect. Since the course of the bullet, backward and upward, was such that had it been fired directly into the body of deceased, the gun firing it would have had to be at a lower level than the point of entry of the bullet, which all the testimony shows was not

the case, the conclusion seems inevitable that the bullet first struck some object which deflected its course backward and upward causing it to enter the body of deceased. Had defendant fired with deliberation and with the intent to take decedent's life he could and undoubtedly would have fired directly at a vital spot. We are not unaware that one of the witnesses testified that defendant shot deceased "point blank," but this witness also said that deceased was seated and defendant was standing, and that defendant pointed the gun at an angle "running down."

We think, as the court said in *People* v. *Castro, supra,* that the attending circumstances neither indicate an abandoned and malignant heart on the part of defendant nor portray a wilful, deliberate or premeditated killing, and that the evidence is insufficient to support a verdict of murder of the first degree. We are not prepared to say, however, that it is not sufficient to support a verdict of murder of the second degree. The judgment of the lower court is therefore modified and the cause is remanded to the lower court with directions to enter a judgment against defendant finding him guilty of murder of the second degree, and thereupon to pronounce judgment upon him as prescribed by law.

Peek, J., and Thompson, J., concurred.