STATE OF NEVADA, Plaintiff and Respondent, *v.*
THEODORE WILLIAM GREGORY, Defendant
and Appellant.

No. 3570

December 30, 1950.                      225 P.2d 1059.

For original opinion see 66 Nev. 423, 212 P.2d 701.

*Leslie B. Gray,* Reno for Appellant.

*Alan Bible,* Attorney General, *Robert McDonald,*
Deputy Attorney General, *Harold O. Taber,* District
Attorney of Washoe County, *Grant L. Bowen,* Assistant
District Attorney of Washoe County, Reno, for Respondent.

*Per Curiam:*
**Petition denied.**

BADT, J., and HATTON, District Judge, concur.

HATTON, district judge, having been commissioned to
sit in this case by reason of the illness of EATHER, J.,
and having written the opinion on the original appeal
and participated in the denial of the first petition for
rehearing, likewise acted upon the second petition for
rehearing, and EATHER, J., did not participate.

HORSEY, Chief Justice.
I dissent.
Upon further consideration as to the probable effect
of the decree of divorce set forth in the principal opinion
in the instant case, as to which this court found that
upon objection of the defendant the admission of said
decree should have been denied, this court, notwithstanding such concession, or admission, that the decree should
have been denied admission, and its admission was,
therefore, erroneous, nevertheless, proceeded to find and
determine that no *prejudicial* error resulted therefrom.
It is true that this justice did concur, heretofore, in

the principal opinion, written by District Judge Hatton, and in which the judgment of conviction of the defendant was affirmed. Further reflection and consideration, however, has led this justice to feel and conclude that in the instant case it is not without reason for this justice to feel seriously concerned as to whether or not the fact of the admission in evidence of the Gregory divorce decree, and in which extreme cruelty was the alleged ground for the relief sought, should have been permitted admission in evidence.

Even though the divorce was not contested, and the allegations of the complaint, including that as to extreme cruelty, were probably inserted to give strength to the alleged cause of action so as to assure obtaining a divorce, rather than that, in fact, the plaintiff in that action seriously intended actually to litigate that matter, on the other hand, such allegation of extreme cruelty may have been seriously calculated to prejudice the defendant.

In that connection, it may well have been readily believed by the jurors, having before them the decree of divorce and the basis of extreme cruelty on which it was predicated, that such alleged extreme cruelty by reason of which the divorce occurred, could have caused the defendant not to have maintained continually friendly relations with Margaret Tarr, the deceased, but that he may have ceased to have close and apparently friendly relations with her, which, for several months they had maintained.

Mention may be made of the cases upon which the defendant principally relies as to the divorce decree, and which are as follows: Binns v. State, 57 Ind. 46, 26 Am.Rep. 48; People v. Holloway, 28 Cal.App. 214, 151 P. 975, 977; and People v. McNeer, 14 Cal.App.2d 22, 57 P.2d 1018, 1020.

From the testimony, it appears fully that Margaret Tarr, soon after the divorce, continued to reside with the defendant at his place of residence in Las Vegas, until, a few days thereafter, she informed him she had made up her mind to go to Reno and seek employment

as a "shill" in a gambling establishment there. She wrote him, soon after she had become located in Reno and had commenced to work as said "shill," and invited him to cease his employment as a barber in Las Vegas and go to reside in Reno, and start to work there, which he did. She was then residing in a hotel in Reno, and Gregory, upon Margaret Tarr's invitation, went to such hotel to reside. Later they mutually determined, in view of the divorce having previously occurred, that they, perhaps, had better leave the hotel and go to reside in a private home in Reno. Each of them, Margaret Tarr and Gregory, took adjoining rooms at said home, and commenced to reside there. The owners of the home were Mr. and Mrs. Eichelberger. Apparently all went along nicely as to Margaret and Gregory. The latter frequently took her to dinner and to the movies, and, until shortly before this tragedy occurred, they were apparently fond of each other. Gregory proposed remarriage, and took her to select some jewelry, in contemplation of remarriage. It appeared they expected to remarry in about two or three weeks.

Apparently they continued to be very friendly, and all went well until early one morning, when Margaret was much later than usual in arriving at her room at the Eichelberger home, where they each resided, and shortly before Gregory had to go to work. Margaret, at several hours later than usual, rode up in a fine limousine, accompanied by one Darrel Birch, a floor boss at Harold's Club, one of the large gambling establishments in Reno. Gregory was, apparently, much surprised, and, according to the evidence, became imbued with much worry and anxiety. Birch drove away, in the early morning, and Gregory wished to know, from Margaret, what it was all about. She, Margaret, was cold toward him in her reply, and said nothing to appease his injured feelings.

During the next several days, Gregory tried to talk to Margaret, but received little satisfaction. Apparently, Gregory was very fond of her, and continued to try to be friendly with her, and to endeavor to ascertain what

he should do. She continued to be indifferent toward him.

One morning, several days later, Gregory arose, and, looking out from his window, saw the same limousine drive up to the curb alongside the sidewalk of the Eichelberger home, shortly after daylight, in the early morning. At that time Birch and Margaret did not emerge from the car. Gregory was so nervous and distraught that he even failed to remove his pajamas, but hurriedly pulled his trousers over his pajamas, picked up a Luger revolver which he had owned for a number of years, and rushed out to the limousine. Peering in the car, he saw Margaret and Birch in each other's arms, in fond embrace. They were so fully oblivious to what was otherwise occurring that they were apparently unconscious as to the presence of Gregory. The latter, being unable to restrain himself, reached in the car, grabbed Margaret's hand, or wrist, and pulled her away from Birch. Of course, there were angry words, but Gregory did not offer to use his revolver. On the contrary, he placed same in his belt. He forced himself into the car, and told Birch he and Margaret had planned to be married soon. And Margaret, very coldly, told him she did not wish anything further to do with him. They were in front of the Eichelberger home, but soon one of them suggested not arousing the neighbors, to which they apparently all agreed, and then Birch drove the car for several blocks. From the evidence, it appears that they were continually quarreling, but Gregory, during all that time, did not offer or threaten to shoot either Margaret or Birch, but kept the revolver in his belt. Gregory tried to induce Margaret to tell him what she intended to do, reminding her of their engagement to be married in about two or three weeks. She then replied to Gregory that he was a "liar." Then, trying to appease the tense situation, Birch said to Margaret, in effect: "If you have promised to leave Gregory, why don't you tell him?" Margaret, fawning on her newly-acquired lover, said in effect: "I won't tell him unless you tell

me to." This was too much—more than Gregory could stand. It was then that Gregory suddenly, for the first time, aimed his revolver at Birch and Margaret, and, at first, said he would kill them both, but then relented, in that, as Gregory recalled at the trial, Birch had not done anything to him, Gregory, and immediately ordered him to go, that is, leave the automobile. But immediately after that, and when Birch was about to leave the car, Gregory, apparently in a very excited and erratic frame of mind, told him not to go, but to stay there. It was then that Birch jumped out the open window of the car, and ran, and immediately thereafter Gregory evidently fired, and Birch continued to run. Shortly thereafter the police came, and Gregory was arrested, and it was found by the police that Margaret was dead. That Gregory was greatly excited and almost "beside himself" with anger, no one, under the circumstances, can reasonably doubt.

The question as to whether, under the circumstances, Gregory, goaded and aggravated as he was by Margaret, fired wilfully and with deliberation and premeditation, or, in fact and in truth, acted under the immediate effect of an overpowering anger and passion, and without any sufficient time in which the passions of Gregory might be permitted to cool and for the voice of reason and humanity to be heard, it is difficult, from the evidence, to determine. Under such circumstances, it would seem that the sudden anger on the part of Gregory, and which was strongly aroused by the cold and wholly inconsiderate acts or conduct of Margaret, was well-nigh irresistible, insofar as Gregory was concerned. Having acquired a new lover, possessed of more money than Gregory could afford, apparently Margaret cared nothing whatever about the pride or feelings of Gregory, or the danger her action might cause. It is true that more than a hour had elapsed, commencing at the time Gregory approached the automobile in front of the Eichelberger home, and reached in and grabbed Margaret by the arm, and before the killing later occurred, and, ordinarily, such hour, or

thereabouts would have been sufficient for the heat of passion to subside and for the voice of reason and humanity to be heard. But the passion, which, from the evidence, doubtless may be considered great in degree, did not manifest itself until the cold-blooded ultimatum of Margaret, and her "fawning" upon Birch, after her treatment of contempt and scorn toward Gregory. Thus, it reasonably appears to this justice, upon consideration, carefully, of the evidence, that Gregory's passion was suddenly aroused to a whiteheat of irresistible fury, caused by adequate provocation on the part of Margaret, and that, within a very few seconds, it appears from the evidence, Gregory fired, and killed Margaret.

This justice's belief is that, under the proper legal conception, the killing of Margaret was, in view of those circumstances, more likely voluntary manslaughter than any other degree of the offense. Gregory could not, it is believed, restrain his passion under the very great provocation with which he was then suffering, entirely without his fault, and voluntary manslaughter, it is believed, fits closer the true situation than would second-degree murder.

But be that as it may, there cannot reasonably be any question but that second-degree murder would fit the requirements of the law as to the proper punishment for Gregory. First-degree murder would be too great a penalty, under the circumstances, and if the death penalty were carried out, same would amount, this justice sincerely believes, to a travesty upon justice. The death penalty should never be invoked in a criminal case except under the most extreme circumstances. Gregory has not been shown to have heretofore ever been even arrested for any criminal offense, which should weigh very greatly in his favor. Commutation from death to life imprisonment is, under the circumstances, probably the only reasonable course. This justice does not hesitate to say, under the circumstances, referring to the proceedings which were had before the board of pardons

and parole in regard to possible commutation from death to life imprisonment, in the matter of State v. Gregory, that commutation was denied by a majority of only one vote. Great care should be exercised in determining, soundly and justly, the correct degree of homicide which should properly be invoked in cases such as this Gregory case.

Reference is made to cases from California which appear to elucidate very clearly the principles of law and their appropriate application, in relation to the crime of homicide and its several degrees. In that connection, see: State v. Howard, 211 Cal. 322, 295 Pac. 333, 71 A.L.R. 1385-1394; People v. Daniel, 65 Cal. App.2d 622, 151 P.2d 275.