[Crim. No. 5330.   Second Dist., Div. Two.   Oct. 17, 1955.]

THE PEOPLE, Respondent, v. PHILIP D. SCHWAB, Appellant.

Morris Lavine for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

MOORE, P. J.—Pursuant to a verdict, appellant was convicted of burglary in the first degree and of assault with a deadly weapon with intent to commit murder. He seeks a reversal of the judgment which sentenced him to prison for two consecutive terms and from the order denying his motion for a new trial on the grounds that (1) the evidence is insufficient to sustain the judgments as to either count and (2) errors in giving and refusing instructions.

## The Evidence

Appellant knocked down and cut William Duncan about 1 o'clock in the morning of July 3, 1954, in the latter's home. In view of his contention that he was unconscious at the time of his crime, it is necessary to review the occurrences of the

immediate past in which the prisoner and his victim participated.

Appellant and his wife Irene were married in 1940. Their two children were Johnny and Carol, aged 9 and 10. Prior to May 1954 they had resided in San Pedro, but at that time, Irene sued for divorce and Schwab moved to Buena Park. After the action was filed, Irene's lawyer requested Mr. and Mrs. Duncan to call the police if appellant should disturb his wife and children. This the Duncans undertook to do. About the middle of June 1954 after Mrs. Duncan observed appellant enter his wife's home, she telephoned Mrs. Schwab, inquired as to her safety. Mr. Duncan and his father-in-law approached the rear of the home to watch. Within 10 minutes appellant departed for his automobile parked about three blocks away. To be sure that appellant was out of the way, Duncan walked along the same street on the opposite side, but did not speak.

Prior to Saturday, July 3, Irene confided to the Duncans that appellant had beaten her and that she feared her husband would kill her. On Sunday, June 27, while the Duncans were at Peck's Park, appellant and his friend Gutierrez found Carol and the Duncan child at play in the Duncan car and questioned them. When Duncan saw appellant and his companion approaching, he went forth to meet them, followed by Mrs. Martin, his mother-in-law. When asked by Duncan what they were doing, unpleasant words passed between them. Duncan became angry and told them to leave. Mrs. Martin told Gutierrez that he was the same man that had called at her house and asked questions, she was called "a damn liar." More angry words passed and Duncan told them to leave. They made their exit with the declaration they were going for the police. Instead, they obtained an order for Duncan to show cause why he should not be restrained from interfering with appellant's reasonable visits to his children. Such order was served on Duncan about 6 p.m. on July 2. That same evening, little Carol retired about 9:30 and was awakened by a knocking on the back door. When she heard footsteps coming to the front door, she looked through the window and saw appellant as he entered the front. Carol made her escape through the back door and attempted to open Duncan's rear door. Thereupon, appellant came out with an open knife and a flashlight in his hands, threw down the knife and opened Duncan's screen door. With his left hand he then picked up the knife and ordered Carol to go into her house.

He changed the knife to his right hand and held the flashlight in his left. Thus equipped, he entered the Duncan house, calling out: "Where is Irene?"

About the time he was pushing into the home of the Duncans, they were awakened by Irene's rapping on their window as she asked them to call the police. While the women were trying to reach the police by telephone, Mr. Duncan dressed, passed through his living room and dining room where he turned on the light and saw appellant enter the kitchen with an open knife in his right hand and a flashlight in his left. Having first inquired, "Where is Irene?" appellant said, "This is it. I am going to kill you." With that he kicked Duncan in the groin, causing him to double up with pain. As appellant followed with blows and cuts with his knife, Duncan went from dining room to a bedroom and back to dining room where the wretched man collapsed. Appellant then stood over him and said: "There, I guess that will take care of you." As appellant was leaving the house, Mrs. Duncan pointed at him an unloaded .22 rifle she had gotten from her closet, and with emphatic speech ordered him to get out. That he hastily did.

Duncan was bleeding from multiple lacerations. He was conveyed under an oxygen tent to the hospital and given blood transfusions. It required two doctors and three and a half hours to sew up the wounds with about 200 sutures. One cut extended 34 centimeters from the base of the neck down the left side, severing all the superficial posterior neck muscles. Ugly wounds had been inflicted upon the left wrist and the deltoid muscle. An eight centimeter deep cut severed most of the left trapezius muscle. The left jaw was cut "from the ear lobe to the mandibular notch" slicing a salivary gland and causing it to atrophy. A seven centimeter furrow on Duncan's left forehead severed face muscles. Cuts sliced through the left lower anterior chest, and the base of the right heel. The victim of this frenzied panther passed near death's door. Although treated with antibiotics, his condition was precarious. Five days later he suffered a pulmonary embolus. Only by the ministrations of oxygen and indicated remedies were the doctors able to control the blood clotting in the lungs.

Schwab testified that he had gone to the Duncan home to talk to his wife; that he had no intention of injuring either her or Duncan; that Duncan met him in the kitchen and hit him in the face; that the next thing he remembers was his

walking in the hills at dark time; that he did not know the hour, did not have his jacket on; that on arriving at a main highway, he thumbed a ride to Carson and Figueroa about 4 a.m.; that on arriving at an open service station, he telephoned his friend Gutierrez; that after their conference, he telephoned his lawyer and then he and Gutierrez drove in appellant's car among the hills for about two hours only to discover his automobile 10 miles from Mrs. Schwab's home. He then went to Buena Park, but surrendered to the police.

By virtue of appellant's testimony that he had no memory of any of his acts after meeting Mr. Duncan in the latter's home about 1:30 a.m. July 3, he contends that he could not be guilty of either burglary or assault with a deadly weapon. A determination of that fact is not as easy as it appears to appellant. If the jury had had no proof before them except his testimony, they might have made a finding favorable to appellant's claim. But it was their duty to consider all the facts detailed from the witness stand. They were cognizant of the long controversy of appellant and Irene; of his having been ordered not to molest her; of counsel's request that Duncan watch over her and notify the police in the event appellant should disturb her.

It was proved that appellant had obtained a court order that he might see his children but had been frustrated in his attempts to visit them; that after his consultation with a neighbor of Mrs. Schwab, appellant and Gutierrez had gone to Peck's Park and had seen one of his children and they were approached by Duncan who used abusive language to the men and threatened them with the police. At that time Mrs. Martin reminded Gutierrez how he, at her home, had called her a "damn liar"; how other vile words were then used and Duncan drove them from the park, followed them with his dog along the street to appellant's automobile and ordered them to get out or they would get it; how the two men departed for the police station and reported the incident. About June 30 appellant talked with his son on the telephone and was told by the child the latter and his mother were going away and would not see appellant anymore. Such statement made appellant "feel very bad." On July 2, appellant vainly attempted to engage Irene in conversation by telephone. Failing to do so, he drank six cans of beer. From that time, appellant pursued his purpose without success. About 12:30 a.m. he went to her place of residence, and thence into Duncan's home where the tragedy occurred.

The jury had the duty to determine whether appellant was unconscious when he entered Duncan's home and knew nothing of slashing Duncan with his knife, or had entered the place with malice in his heart and a preconceived purpose in his mind to punish the man who, he thought, had defeated his attempts to reconcile his family; the man who had driven him from a public park and threatened him with the police. The facts are such as would have justified a jury in finding that appellant was filled with beer and carried a heart of hate; that he had been irritated by Duncan's behavior and sought to be avenged; that he had armed himself with a small knife and a flashlight to find his way into strange premises and to cut his way to freedom from interference. Performing a diabolical act while unconscious is an event of such rare occurrence that a jury might be justified in scorning it as unreasonable and false, and in adopting the conclusion that the crime was the outgrowth of dire resentment and wicked aims.

It follows that if the jury believed appellant entered Duncan's home to murder or to assault the sleeping man with a deadly weapon, he was guilty of burglary the moment he entered. (*People* v. *Franklin,* 106 Cal.App.2d 528, 530 [235 P.2d 402] ; *People* v. *Stewart,* 113 Cal.App.2d 687, 690 [248 P.2d 768] ; *People* v. *Smith,* 84 Cal.App.2d 509, 511 [190 P.2d 941].) Where the circumstances of a burglary reasonably indicate that the prisoner's intention was to commit a felony, a conviction will not be disturbed on appeal. (*People* v. *Swenson,* 28 Cal.App.2d 636, 639 [83 P.2d 70].) Even though there had been contradictory evidence such as to warrant a contrary finding, the reviewing court will not substitute its finding for that of the jury. (*People* v. *Lynch,* 60 Cal.App.2d 133, 139 [140 P.2d 418].)

When appellant left the back door of his wife's apartment, he picked up his knife he had just thrown down and put it into his right hand. When he met Duncan, his outcry did not sound like that of an unconscious person. Rather did it express a heart of purpose and resolve: "This is it. I am going to kill you." Slamming his boot into Duncan's groin looks more like the act of a cool, calculating, vengeful killer, aiming to mow down his antagonist at a single blow. Neither does the phenomenon of an angry person's entering the home of his enemy at midnight appear to have been the result of a paralyzed brain; nor do the vicious cuts and blows rained by him on a fallen foe evidence a benumbed

intelligence or one devoid of the moral sense. The series of events commencing with appellant's conception of the purpose to arm himself with only a small knife and to visit Duncan in the dead of night, reasonably warranted the jury in determining that appellant considered Duncan his enemy who was helping Irene keep appellant away from his family and on that account had imbibed sufficient alcohol to screw his courage to the sticking place and had, like Macbeth, gone in quest of Duncan to destroy him. ▇ The situation, the occurrences and results invoke the doctrine announced repeatedly by the Supreme Court, to wit: It is the jury's function to determine what facts are established by the evidence, for the trial court to determine whether such facts are sufficient to support the verdict. When such matters have been legally determined, the reviewing court is powerless correctly to reverse the judgment unless it be made clear that under no reasonable theory does the record disclose sufficient substantial evidence to support the conclusion of the trial court. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Albertson,* 23 Cal.2d 550, 590 [145 P.2d 7]; *People* v. *Vest,* 65 Cal.App.2d 774, 780 [151 P.2d 666]; *People* v. *Daniel,* 65 Cal.App.2d 622, 634 [151 P.2d 275].)

▇ Appellant's contention that he testified that he was unconscious at the time of his crimes and therefore should have been acquitted is answered by the law that the jury were not obliged to believe him. (*People* v. *Marble,* 8 Cal.2d 139, 140 [64 P.2d 135].)

### INSTRUCTIONS NOT PREJUDICIAL

▇ Appellant assigns as prejudicial the giving of the following instruction:

"The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. Whether or not evidence of flight shows a consciousness of guilt, and the significance to be attached to such a circumstance, are matters for your determination."

His argument is that inasmuch as the proof was that he departed from Duncan's home under the emphatic command of Mrs. Duncan and her rifle, that he ambled into the dark hills near San Pedro and later surrendered to the police, he

could not have been guilty of flight or of a show of consciousness of guilt. The evidence shows that after he had given his final salutation to his fallen foe, he straightway made his way out. True, he was encouraged by Mrs. Duncan's rifle, but he was then outside the inclosure. He slammed the door and ran toward the alley. An unconscious man has no fears of retribution. He testified that he found his car 10 miles away, but did not surrender until some 18 hours afterwards. Surely, such delay was the result of calculation rather than from a chill of oblivion.

There was no error in the instruction. The facts are some proof of a purpose to escape detection. While his flight may not have been sufficient in itself to establish guilt, his movements were such as to justify their consideration as evidence of a consciousness of guilt and the finding of the weight to be given them was a function of the jury. (Pen. Code, § 1127c.) The jury were not arbitrary in reasoning that his flight to the sombre hills and his loitering there or elsewhere in secret for many hours indicated his own belief that he was guilty. (*People* v. *Easton*, 148 Cal. 50, 53 [82 P. 840].)

The following instruction is assigned as prejudicial: "When a person commits an act without being conscious thereof, he does not thereby commit a crime even though such an act would constitute a crime when committed by a person when conscious.

"Although the law recognizes insanity, when pleaded, as a defense to a charge of crime, it deals with the question raised by such a plea in an independent proceeding and you are not concerned with such a question in this trial.

"There is no plea of insanity in this case!"

No prejudice could have resulted from such instruction. It did not direct the jury that appellant must have pleaded insanity to entitle him to a consideration of his argument that he was unconscious. The mention of "an independent proceeding" under an insanity plea did not tend to relieve the jury of the duty to determine whether appellant was unconscious. The jury are presumed to have been intelligent, endowed with fair understanding, capable of interpreting English words in ordinary use. (*People* v. *Glaze*, 139 Cal. 154, 164 [72 P. 965].) There is nothing in the instruction calculated to induce the jury to believe that the word "unconsciousness" is synonymous with "insanity." The instruction was not such as was calculated to advise the jury that the asserted unconsciousness was not an issue.

REQUESTED INSTRUCTIONS

█ Appellant requested an instruction* to the effect that if a person commits an act while he is unconscious he is not guilty even though it is a crime if done by a conscious person. Such instruction would have been repetitious and argumentative. The jury had already been advised with respect to the noncriminality of an act done during the unconsciousness of the actor; that the specific intent to commit an assault with intent to murder "must exist in the mind" of the offender "and the defendant may not be convicted of such offense if that specific intent is not established by the elements" and that "to convict the defendant of the crime of assault with a deadly weapon with intent to commit murder you must believe beyond a reasonable doubt that the defendant assaulted William Russell Duncan with a deadly weapon with malice aforethought and with the deliberate and express intention of taking the life of the said William Russell Duncan." Also, the court had told the jury that "where a person commits an act without being conscious thereof, such an act is not criminal, even though, if committed by a person who was conscious, it would be a crime."

█ Appellant assigns as prejudicial also the court's refusal to give an instruction† as to evidence susceptible of two constructions. His point is that the only evidence of his

---

*"Where a person commits an act without being conscious thereof, such act is not criminal even though, if committed by a person who was conscious, it would be a crime.

"This rule of law does not apply to a case in which the mental state of the person in question is due to insanity, mental defect or voluntary intoxication resulting from the use of drugs or intoxicating liquor, but applies only to cases of sound mind as, for example, somnambulists or persons suffering from the delirium of fever or of the involuntary taking of drugs or intoxicating liquor, and other cases in which there is no functioning of the conscious mind and the person's acts are controlled solely by the subconscious mind."

†"If the evidence in this case [as to any particular count] is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of the defendant's innocence, and reject that which points to his guilt.

"You will notice that this rule applies only when both of the two possible opposing conclusions appear to you to be reasonable. If, on the other hand, one of the possible conclusions should appear to you to be reasonable and the other to be unreasonable, it would be your duty to adhere to the reasonable deduction and to reject the unreasonable, bearing in mind, however, that even if the reasonable deduction points to defendant's guilt, the entire proof must carry the convincing force required by law to support a verdict of guilt."

intent to commit the crimes charged was circumstantial and that, therefore, he was entitled to have such instruction given, citing *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8], and *People* v. *Tholke,* 75 Cal.App.2d 857 [171 P.2d 904]. But appellant misses the point of such authorities. They authorize such instruction only where substantially all the evidence is circumstantial. Such is not true of the controversy here involved. Such instruction is not necessary where the direct evidence of defendant's guilt is clear. (*People* v. *Koenig,* 29 Cal.2d 87 [173 P.2d 1]; *People* v. *Bletson,* 117 Cal.App.2d 731, 734 [256 P.2d 614]; *People* v. *Levene,* 107 Cal.App.2d 125, 129 [236 P.2d 604].) From such pronouncements, it is established that whether such an instruction is required depends upon the evidence in the case. (*People* v. *Bletson, supra; People* v. *Guthrie,* 113 Cal.App.2d 720, 723 [248 P.2d 947].)

There is too much direct evidence in this record to warrant such an instruction as that proposed. Appellant entered the apartments of Irene, his estranged wife, at midnight after futile efforts to visit her. Disappointed at not finding her, he armed himself with a knife and marched to the nearby home of Duncan who had frustrated his recent attempts to converse with Irene. When he called his wife's name, Duncan appeared, to resist the intruder. Promptly he laid Duncan low with his kick in the groin, and, slashing with his knife until Duncan was a mutilated beaten man at death's door. That is not circumstantial evidence; it is direct.

Whatever might be said of the instructions given or rejected, it cannot reasonably be said that any ruling with respect to instructions resulted in a miscarriage of justice. (Const. art. VI, § 4½.)

Judgment and order denying motion for new trial are affirmed.

McComb, J., and Fox, J., concurred.