[Crim. No. 1678. Third Appellate District.—September 18, 1939.]

THE PEOPLE, Respondent, v. WALTER ARTHUR ROSS, Appellant.

J. Oscar Goldstein and Burton J. Goldstein for Appellant.

Earl Warren, Attorney-General, and J. Q. Brown, Deputy Attorney-General, for Respondent.

TUTTLE, J.—Defendant was convicted, after a jury trial in the county of Butte, of the crime of murder in the second degree. The information charged him with having murdered one Charlotte Boyd, in the city of Chico, Butte County, California, on the 26th day of July, 1938.

Defendant moved the trial court to modify the judgment and enter a judgment against him of manslaughter. The trial court refused to so modify the judgment, and appellant now asks this court to modify the judgment to manslaughter, which may now be accomplished without a new trial, under section 1181 (6) of the Penal Code.

Appellant's first point relates to the power of the appellate court to modify this judgment to that of manslaughter. Respondent concedes that this court has such power under the above section of the Penal Code as it now reads. We are therefore concerned only with appellant's second point, namely, whether the evidence is sufficient to sustain the verdict of murder, or whether the evidence will only sustain a judgment of manslaughter.

The defendant Walter Ross was twenty-four years old at the time of the murder. His paramour, Charlotte Boyd,

the deceased, was thirty-one years of age, and had been married for ten years. She lived with her invalid husband in Chico, California. The murder took place on Oak Street, between First and Second Streets, in the city of Chico. Defendant spent his boyhood in the vicinity of Fresno following the trade of electrician's helper. He met Charlotte in a restaurant in Chico in July, 1937, just about one year before he took her life. After defendant and Charlotte became better acquainted, according to defendant's own testimony, they commenced having sexual intercourse. Although defendant knew Charlotte was married, these relations became more and more intimate, and while defendant does state that during the year of their intimacy, the question of Charlotte procuring a divorce and marrying him was touched upon, nothing was ever done about it, and indeed, the subject, if discussed at all, was of a very chimerical nature.

In November, 1937, defendant attempted to break off with Charlotte, and went to Fresno to live with his mother. He corresponded with Charlotte, however, and in March, 1938, again succumbed to his amorous desires, and went back to Chico, there to continue his adulterous relations with the deceased. Defendant's mother came to Chico to live with him on July 14, 1938, twelve days before the murder. Defendant's own testimony is to the effect that he never drank hard liquor until he knew Charlotte, so that his drinking proclivities continued for less than one year; only eight months, when we omit the period from November, 1937, to March, 1938, when he was in Fresno with his mother.

Upon the day of the murder the defendant made an appointment with Charlotte, and drove to the above locale in his car, taking with him a high-powered hunting rifle that carried a load of 30–006 shells. He was seen at about 2 :00 P. M. by Mrs. Anna McIntosh to stop his car and carry a gun toward the thicket of Chinese locust trees where the murder took place about five hours later. Defendant then got into Charlotte's blue sedan car with her and they drove off together. They returned later and the two cars were parked at the locale on opposite sides of the street, Charlotte's car being off the highway into the thicket. At about 7 :00 P. M. eye-witnesses testified very clearly that they heard a cry and a shot and a groan coming from the car, and that they saw defendant standing just outside the car opposite the right front door; that they saw a figure slump behind

the wheel, over to the right side of the seat; that defendant either opened one or two doors of the car, and placed something in the rear (which by fair inference can be said to be the gun), walked around behind the car to the left front door, opened it, got in and drove off. He then drove up the street, came by the Brattenburgs, and waved to them, and stopped at the home of Mr. Bleecher, his boss, where he had a very rational talk with Mrs. Flo Bleecher concerning the notification of his mother, and of putting his affairs in order. That he then drove off. That Mr. Brattenburg and his young son went over to the spot to investigate, and that defendant came back again, slowed down, and they thought he was going to stop, but he suddenly speeded up, Mr. Brattenburg having to grab his son to keep the latter from being struck by the car. That defendant then speeded up the street and was gone.

Defendant next appears at the Lomo Tavern, at about 8:30 P. M. This is about thirty-one miles from Chico, over hilly country. The bloody corpse of Charlotte was still at defendant's side. Defendant went into the tavern and was observed by many witnesses. He then left and drove over to Butte Meadows, entering a roadhouse run by one Grace Taylor. He came in carrying his rifle, and had several drinks of whiskey. He confessed orally to the killing, and said what "he would do to the law if they came for him." Subsequently, he was thrown down, disarmed, and tied up to await the coming of the sheriff. Charlotte's corpse was still outside in the car.

The only relief asked of this court is that the judgment be modified by reducing the crime to that of manslaughter, and the inquiry must be directed to the question as to whether or not the evidence was sufficient to sustain a verdict of murder in the second degree. If it is, the judgment must stand. Precisely, the contention of appellant is that: "There is no evidence in the entire case, either from the witnesses for the People or the defendant, showing or tending to show motive, malice or premeditation on the part of the defendant herein, and the crime proved is only one of manslaughter; therefore, the trial court, as a matter of law, should reduce the conviction of murder in the second degree to manslaughter."

"Murder is defined as the unlawful killing of a human being with malice aforethought. (Sec. 187, Pen. Code.) Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature, and implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. (Sec. 188, Pen. Code.) All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary or mayhem, is murder in the first degree; and all other kinds of murders are of the second degree. (Sec. 189, Pen. Code.) To be murder of the first degree, under our statute, the killing must be premeditated, except when done in the perpetration of certain felonies; that is to say, the unlawful killing must be accompanied with a deliberate and clear intent to take life. If the act be preceded by, and be the result of a concurrence of will, deliberation and intent, the crime of first degree murder is proved. (*People* v. *Bellon*, 180 Cal. 706 [182 Pac. 420].) When the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree. (*People* v. *Knapp*, 71 Cal. 1, 6 [11 Pac. 793] ; *People* v. *Ford*, 85 Cal. App. 258, 263 [258 Pac. 1111].)" (*People* v. *Howard*, 211 Cal. 322, 328, 329 [295 Pac. 333, 71 A. L. R. 1385].)

"Murder" (in the second degree) "is an unlawful killing with malice, but without deliberation or premeditation. . . . In first degree murder the evidence must show that there was a deliberate intent to take life, while in that of the second degree, the intent to take life need not be proven, and may not in fact exist; it is implied from the fact of an unlawful killing." (13 Cal. Jur., p. 603, sec. 18.)

In *People* v. *Ford*, 85 Cal. App. 258, 262, 263 [258 Pac. 1111], it is said: "Another point mentioned, but not strongly urged, by appellant, is that it was error for the trial court to instruct the jury that a verdict of murder in the second degree might be returned. There is no merit

to this claim. The proof established a case where such an instruction was peculiarly apt—in fact, necessary. The evidence against the appellant was almost entirely circumstantial; there was no definite proof of motive, nor as to what conduct or conversation immediately preceded the killing. Although the jury believed that the appellant slew the deceased, there was no evidence of that deliberation preceding the act which is necessary to constitute murder of the first degree. On the other hand, there was also an absence of proof of provocation and sudden passion which would bring the offense within the definition of manslaughter, and without which the only lawful verdict must have been one finding the defendant guilty of murder. This is so since upon the commission of homicide by a defendant having been established, the crime is murder unless there is evidence produced either by the prosecution or the defense affirmatively showing circumstances of mitigation which would bring the murder within the definition of manslaughter. Therefore the jury legally and logically returned a verdict of murder in the second degree, for the circumstances of the killing were certainly such as to show an abandoned and malignant heart.'' In 13 California Jurisprudence, page 609, it is stated:

''Voluntary manslaughter is the unlawful killing of a human being, without malice, upon a sudden quarrel or heat of passion. The law requires the existence of but one of these conditions, as provocation to reduce a felonious homicide from murder to manslaughter. When a mortal blow is struck upon a sudden quarrel or in the heat of passion, upon adequate provocation, the actual intent is disregarded. In such case, although the intent to kill may exist, it is not that malicious intent which is an essential element in the crime of murder.''

Applying the foregoing rules and definitions to the facts here, we are satisfied that there is ample evidence to sustain the verdict of murder in the second degree. Evidence of deliberation or premeditation is not necessary. The killing was clearly shown to have been committed by defendant. Assuming that nothing further was shown, ''the presumption is that it was malicious and an act of murder''. (Howard case, *supra*.) As to the offense of manslaughter, none of the elements prescribed in section 192 of the Penal Code appears in the evidence. There is a complete absence of proof

of a sudden quarrel or heat of passion. On the contrary (using the words of appellant), "the record is clear that during the whole time that Ross knew and loved Charlotte they never had a single cross word".

Much faith is placed by appellant in the case of *People* v. *Kelley*, 208 Cal. 387 [281 Pac. 609]. There the verdict was murder in the first degree, without recommendation. The Supreme Court remanded the case to the trial court, with directions to find the defendant guilty of manslaughter. There is no discussion in the case as to whether or not the evidence would justify a verdict of murder in the *second* degree. The court finds that the elements necessary to constitute murder in the *first* degree were not proven, in that there was "no evidence that there was a wilful, deliberate and premeditated killing". As we have seen, the presence of those elements is not necessary to constitute murder in the *second* degree. In fact, section 189 of the Penal Code expressly so provides. Furthermore, in the Kelley case the court states that there was prejudicial error in the record which would call for a reversal of the judgment, were it not for the fact that it had the power to modify the judgment. No errors of any character are urged by appellant here, except the refusal of the trial court to modify the judgment. The case sheds little light on the ultimate question to be decided here—Does the record sustain the verdict of second degree murder?

The case of *People* v. *Peter*, 125 Cal. App. 657 [14 Pac. (2d) 166], likewise relied upon by appellant, was one where the appellate court directed the trial court to modify a judgment of second degree murder by entering a judgment of manslaughter. The facts clearly indicate there that the shooting was done in the heat of passion, following a quarrel over a card game. The crime, therefore, was manslaughter, and not murder. In the instant case, as we have pointed out, such evidence is entirely lacking, and there appears to be no immediate provocation for the killing.

■ Counsel for appellant emphasizes continually the habit of defendant in respect to the consumption of intoxicating liquor and the effect thereof. The answer to this argument is contained in section 22 of the Penal Code, which reads as follows:

"No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having

been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act.''

Dr. Catton, a medical expert, testified:

''In other words, having taken myself through those whole five tests, I come out with the conviction that he (the defendant), satisfied all the tests of being conscious rather than unconscious during the episode, wherein he states that he was not conscious.''

There was ample evidence to justify the finding upon the part of the jury that defendant knew just what he was doing when he took the life of his paramour. All of these matters were questions of fact for the jury, and under the record here, the proper place for their presentation was in the argument at the trial.

In conclusion, we are of the opinion that the jury might well have found that defendant was guilty of murder in the first degree. There is evidence of preparation and premeditation, consisting of the taking of the rifle on the proposed ride with the deceased, and the further evidence that he was seen to take the gun from his car, at the scene of the crime, and walk toward the shrubbery which bordered the road. The jury may have decided to deal leniently with defendant on account of the conduct of the deceased. She was married, and some seven years older than he The record would bear out the assertion of appellant's counsel to the effect that defendant was the victim of her unnatural and consuming lust,—not that he was an unwilling victim at the beginning, but toward the end of the episode he may have found himself degenerating physically and morally, and for this reason made up his mind that the only release from his predicament was to destroy her. That he intended to do so, there can be no doubt.

We have carefully examined the entire record, and are satisfied that the disposition of the case made by the jury was a proper one.

The judgment is affirmed.

Thompson, J., concurred.