[Crim. No. 3274. Second Appellate District, Division One.—February 15, 1940.]

THE PEOPLE, Respondent, v. JOSE CASTRO, Appellant.

Stanley Visel for Appellant.

Earl Warren, Attorney-General, and Bayard Rhone, Deputy Attorney-General, for Respondent.

YORK, P. J.—Appellant was charged with the murder of his wife, Gloria Castro, was tried by the court sitting without a jury, was found guilty of murder in the first degree and sentenced to San Quentin prison for life. Upon this appeal it is contended that the judgment of conviction ''should be either reversed or the degree of crime reduced from first degree murder to a lesser degree'', in other words, that the evidence is insufficient to warrant a judgment of first degree murder.

At the trial, appellant took the stand in his own defense and gave his version of the crime in terms almost identical with a statement which he made to the officers at the time of his arrest, substantially to the following effect:

He resided with his wife and three small children, ranging in age from five years to ten months, in one room in a rooming house on the east side of Los Angeles, and was steadily employed in a menial position at the Biltmore Hotel, where he worked nights. On June 1, 1939, when he returned home from his work shortly after 1 o'clock in the morning, he found his children sleeping in his room but his wife was absent. After speaking to a Mexican couple, who lived in a near-by apartment, about taking care of the children, he went to the lavatory and while there he heard his wife come into the house, accompanied by her brother, both talking loudly and apparently in an intoxicated condition. He heard his wife ring a bell for the landlady and ask for another room. Meanwhile appellant went upstairs to a porch on the second floor of the house where he could ''watch

everything''. The landlady located an unoccupied room to which appellant's wife took the three children, the blankets from the bed and other personal effects. The appellant then went to his room and finding it in a disordered condition, the blankets gone and the mattress wet, he rang for the landlady whom he asked for 50 cents so he could get another room. The landlady gave him the money and said to him, ''Well, Joe, I glad to see you find your wife come drunk, you know, every night take a drink and come drunk.'' Appellant then told the landlady and her husband that he had a card from a lawyer and wanted to make a complaint about his wife; that he wanted to get a divorce and take the children. Appellant then went out to get a cup of coffee and later returned and stayed in his room until 6 o'clock when he went next door to a restaurant and drank two bottles of beer and brought a quart of beer into his room and drank that. He remained in his room until he heard the children outside on the porch when he went out and saw them running around barefooted and partly dressed, whereupon he went to his wife's newly acquired room and asked her ''Why don't you dress the babies?'' The argument which then ensued, as told in the words of appellant, was as follows: ''I tell her its a shame to see the babies that way. She say 'what the hell do you care you son-of-a-bitch, its none of your business'. I tell her, 'Sure I care, its my babies.' And she say, 'Well you go to hell' and I tell her 'I call the cops last night and the cops see the babies alone,' and then my wife say 'Tell them you and the cops dirty son-of-a-bitches.' She say, 'I not afraid of the cops.' My wife say, 'Anyway, what the hell you want in this room you son-of-a-bitch.' She got up from the bed and pick up the knife from under the pillow? Q. What kind of a knife? A. Pearl handle. Q. Was she drunk? A. Yes. Q. Was the knife open? A. No, she open it. Q. Then what did she do? A. She try to stick me. Q. Did she have the knife in her hand? A. Yes. Q. She was holding the knife in her right hand? A. Yes. . . . I hold her arms (indicating holding wrists), she pushed me against the wall; she was trying to get loose and I tell her throw the knife on the floor and she say 'you and who else is going to make me drop the knife, you son-of-a-bitch', and while I still have hold fighting she say 'you son-of-a-bitch, you God-damn fool', she stick herself in the stomach.

Then she drop the knife on the floor and I pick it up myself and I make pass at her with knife (indicating side-swipe with right hand). Q. Did you cut her? A. I don't know. Q. How many swings did you make. A. Just one. . . . Q. There were two cuts on the body beside the one on the abdomen, one on the neck and one on the wrist—how do you account for those. A. I don't know, I was mad. Just one swipe.'' Taking the knife with him, he then left the house and was apprehended eleven days later in Riverside.

The autopsy surgeon testified that the prime cause of the death of appellant's wife was the stab wound in the abdomen; and that there was also found a clean-cut wound four inches long and one-half inch deep across the upper neck region; and a cut two inches long and one-half inch deep across the inner flexor surface of the right elbow joint, as well as a cut across the palmar surface of the fingers of the left hand.

After the last rites of the Catholic Church had been administered to Mrs. Castro just before her death, Officer Romero interviewed her and asked: ''Q. How do you feel? A. Oh, I am going to die. I know I am going to die.'' Romero then said to her: ''Knowing that you are going to die, you wouldn't want some innocent person to be accused of this stabbing? A. No.'' Then officer Romero asked her, ''Do you still maintain it was your husband, Jose Castro, who stabbed you?''—and she replied, ''Yes.''

A transcript of the evidence given at the preliminary examination before the judge of the municipal court who issued the commitment herein was introduced. This transcript contains testimony given by the brother of Mrs. Castro to the effect that appellant had quarreled with his wife and had struck her with his hand ''a few times'' previous to the occasion which resulted in her death. It also contains testimony of the landlady from whom appellant had rented his apartment that, during the time the Castros lived in her house, she never heard them quarrel; also that about 10 o'clock in the morning of June 1, 1939, she heard a scream and when she went to investigate it, she met appellant in the hall; that she asked him what was the matter, and he replied, ''Nothing''; that he had blood on his hands; that she then heard another scream and went to Mrs. Castro's room where she found her lying on the floor bleeding profusely from a wound in her abdomen; that she asked her

what was the matter, and Mrs. Castro told her "to call the ambulance right away . . . that Joe had slashed her."

 While the record reveals that there had been some arguments or quarrels between appellant and decedent, it was shown by the testimony of the landlady of the apartment house where this couple lived that she had never heard them quarrel. Taken as a whole, the evidence presented falls short of the modicum required for a conviction of murder of the first degree, in that it fails to show that the injuries which decedent suffered were inflicted by appellant "with that intent or that malice aforethought which is a necessary ingredient of the crime of murder". (*People* v. *Kelley*, 208 Cal. 387, 393 [281 Pac. 609].) The attending circumstances neither indicate an abandoned and malignant heart on the part of appellant, nor portray a wilful, deliberate or premeditated killing, but reveal a crime committed "upon a sudden quarrel or heat of passion", i. e., voluntary manslaughter. (Sec. 192, Pen. Code.)

Following the Supreme Court in its interpretation of section 1181 of the Penal Code in the case of *People* v. *Kelley, supra,* at page 391, it is ordered that the judgment of the lower court of murder of the first degree be modified. The cause is remanded to the trial court with directions to enter a judgment against appellant finding him guilty of manslaughter, and thereupon to pronounce judgment against him as prescribed by law.

Doran, J., and White, J., concurred.