174 P.2d 282

**MOORE v. STATE.**

No. 965.

Supreme Court of Arizona.

Nov. 12, 1946.

George D. Locke, George M. Sterling, and Terrence A. Carson, all of Phoenix, for appellant.

John L. Sullivan, Atty. Gen., John W. Rood, Asst. Atty. Gen., and Edwin Beauchamp, Co. Atty., and Fred J. Hyder, Deputy Co. Atty., both of Phoenix, for appellee.

STANFORD, Chief Justice.

From a judgment of the court adjudging the defendant guilty of murder in the first degree and fixing the death penalty based upon the verdict of the jury, and from an order overruling the motion for new trial, this appeal was taken.

The facts disclosed at the trial were that deceased, Willie Moore, and defendant were husband and wife. They were members of the negro race, and had been married and resided together for about 25 years. Both were in their forties. They owned and lived in a house at 1615 East Jefferson Street, Phoenix. This house fronted north on Jefferson Street, and consisted of six rooms, a living room on the northeast front, dining room on the northwest front connected by an archway, a bedroom on the south immediately adjacent to the living

room, with kitchen adjoining dining room on the south, and two back bedrooms. They also owned and operated a bar on Jackson Street. For sometime prior to the homicide, defendant and deceased had been quarreling concerning attentions being paid by deceased to another woman. There had been some talk of divorce.

Sometime in the morning of August 24, 1945, after deceased had gone to the bar, defendant left the premises in her car, and, from her testimony, drove to Tempe, returning sometime between three and four in the afternoon. According to her statement, she drove by the house, saw that the door was closed, and having no key, went to the bar. The deceased was not there and she then returned to the residence, saw that the door was open, parked her car and went in. She testified that her husband was sitting in the living room near a radio, and that almost immediately upon her entrance, she and the deceased began to quarrel; names were passed back and forth. She stated that deceased left the living room and entered the bedroom immediately to the south and returned towards the dining room with a 32-20 revolver in his hand, which he pointed at her. That she entered the dining room through the archway, picked up a 38 pistol which belonged to her from a buffet drawer, and returned towards the living room. When she entered the living room the deceased fired, and she immediately returned the fire. The bullet from her gun struck the deceased in the left side of the face, and he fell backwards in the doorway. She laid her pistol on the dining room table, went to the deceased and attempted to staunch the flow of blood with a handkerchief. She then called the police. When the police arrived the telephone receiver was still disconnected.

Several persons residing in houses adjacent to the home of deceased and defendant, after her entrance into the house heard the voices of deceased and defendant raised in quarrel which continued for several minutes. A pistol shot was then heard, followed by another louder report. The time between the first and second shots was estimated by these witnesses at from six to eight minutes. Tests as to the elapsed time made in the courtroom by some of these witnesses reduced the time to no more than one minute. The evidence also indicated that between the time of the first report and the arrival of the officers, a period of approximately 25 minutes had ensued. The officers appeared at the scene within about five minutes after the call had been put in. No one was in the house except defendant and deceased during the time of the altercation until the officers arrived.

The deceased was found dead, lying on his back with his left hand resting parallel to his head, clinched in spasm, and his right hand stretched out almost horizontally from the body, and resting upon the palm of this hand was the 32-20 pistol. The 38 pistol was found on the dining room table. The defendant was in a more or less hysterical

condition. She admitted to the shooting, but claimed it was done in self defense and practically as above stated. Tests disclosed that both weapons had been recently discharged, an empty chamber being found in each gun. The bullet found lodged in the back of deceased's head against the spinal column was from the 38. Blood stains appeared in the palms of both of deceased's hands. There were no blood stains nor finger prints on the revolver found in his hand.

While, as stated, there had been serious difficulties between defendant and deceased regarding his conduct towards another woman, no evidence was introduced by the state from which any threat of violence by defendant against deceased could be inferred. Defendant's testimony that the shooting occurred during the course of the quarrel is corroborated by the testimony of neighbors who heard the voices of the parties raised in argument, and no further words were heard after the first shot. A thorough examination by the officers failed to disclose any bullet or mark of the bullet which had been discharged from the 32-20 pistol found in the hand of the deceased. It appears that the cooler was on and that all windows were closed. Some evidence was adduced by defendant from which it may be inferred that the front door leading into the living room and in the northwest corner of that room may have been open, and that when the cooler was operating it had a tendency to cause the screen door to stand open. At the time the officers arrived all doors were closed. The fact that neighbors at a distance of fifty or more feet were able to hear the quarrel between defendant and deceased would indicate that there must have been some opening. If the deceased fired at her, as testified by the defendant, while she was standing in or near the archway between the living and dining rooms, it is not probable that the bullet from his pistol would have passed through this doorway if both the door and screen were standing open. There is a possibility, however, that this might have happened. It is the theory of the state, and from all the facts the jury would be justified in so believing, that after defendant had fatally shot deceased, she fired the one bullet from the 32 outside through a doorway or opening, and then placed this revolver in his hand. The testimony is that the second shot was louder than the first, and, as already indicated, considerable period of time intervened between the first and second shots. In other words, that defendant was attempting to lay the foundation for self defense.

A number of assignments have been presented by defendant, some of which will be considered later. Under the provisions of section 44-2535, A.C.A.1939, this court upon an appeal in a criminal case is required, even though no exceptions have been taken in the trial court, to "review all rulings and orders appearing in the appeal papers in so far as it is necessary to do so in or-

der to pass upon the grounds of appeal. * * * The court may also in its discretion, if it deems the interests of justice so require, review any other thing said or done in the cause which appears in the appeal papers, * * *." The second subdivision in this section provides: "Upon an appeal by the defendant from the judgment the appellate court shall review the evidence to determine if it is insufficient to support the judgment where this is a ground of appeal and may review the evidence whether its insufficiency is a ground of appeal or not. Upon an appeal from the judgment by a defendant who has been sentenced to death the appellate court shall review the evidence to determine if the interests of justice require a new trial, whether the insufficiency of the evidence is a ground of appeal or not."

It will be observed that there is a mandatory duty upon this court to review the evidence, and if the interests of justice require, to direct a new trial. We think, therefore, it is our duty to determine whether the evidence upon which the jury acted, and taken in the strongest light in order to support the verdict, is sufficient to justify first degree murder and the imposition of the death penalty.

Stripped of all nonessentials, the question is: Does the testimony make out a case showing willful, deliberate and premeditated murder? If it does, the verdict of the jury should stand unless there are impelling reasons, in the interests of jus-

tice, to set it aside. We think we are bound to follow the ruling of this court in State v. Tuttle, 58 Ariz. 116, 118 P.2d 88, 89, wherein it was said:

"* * * If we had been the jury, we might have given a lessor punishment * * * . The jury saw and heard the witnesses * * *. Those who see and hear the witnesses testify are in a much better position to weigh their testimony than we, and in passing on questions of fact are more apt to be correct than we."

Therefore, in considering this case, we do so upon the assumption that the jury was justified in finding all debatable or controversial facts against the defendant. The question is, conceding all these facts to be true, do they as a legal proposition make out a case of murder in the first degree under the law? These facts so considered may be put as follows: The defendant was jealous of the deceased; she desired a divorce; she and the deceased had quarreled frequently; both parties owned and had available the revolvers which were placed in evidence. There was no direct nor positive proof from which any inference could be taken that prior to the time of the actual homicide defendant intended to kill deceased. The evidence showing, or tending to show, that the shooting of deceased by defendant was willful, deliberate and premeditated must rest upon the facts as they existed or have been shown by the testimony at the time of the killing itself and upon what the defendant

75

did thereafter. The testimony of the neighbors indicate beyond any doubt whatsoever that the shooting occurred during the course of a quarrel. The evidence which was or could be found by the jury is to the effect that after the shooting defendant took deceased's pistol (the 32), discharged it and then placed it in his hand for the purpose of showing that she had shot in self defense.

Murder is the unlawful killing of a human being with malice aforethought. The malice may be either expressed or implied. It is implied where no considerable provocation appears. First degree murder, in so far as this case is concerned, is murder perpetrated by a willful, deliberate and premeditated killing. It is said that the deliberation and premeditation necessary to support murder in the first degree need not be evidenced by any appreciable space of time between the intention to kill and the unlawful act of killing. It is said that the deliberation and premeditation may be as instantaneous as successive thoughts of the mind. Yet under the statute, if one unlawfully kills another without malice upon a sudden quarrel or heat of passion, such killing does not constitute murder but manslaughter. Sec. 43-2904.

The statute defining malice states: "Such malice may be express or implied. It is expressed when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature; it is implied where no considerable provoca-

tion appears, or when the circumstances attending the killing show an abandoned and malignant heart." Sec. 43-2901. Both murder of the first and second degree must disclose that the killing was with malice aforethought, but in addition to the malice, to support a first degree charge of murder, it must be evidenced as provided in Sec. 43-2902, either by the means used, poison, lying in wait, torture, or when the killing is done in the perpetration or attempt to perpetrate certain felonies. If none of these elements appear, the evidence must show in some manner that the killing was "wilful, deliberate and premeditated."

Taking all these statutes into consideration, it is evident that even if a killing occurs upon a sudden quarrel or is the result of heat of passion, malice may be implied if no considerable provocation appears for the killing. If nothing further appears, the killing under such circumstances would be second degree murder. If, however, the evidence under such circumstances can be said to be wilful, deliberate and premeditated, the murder would be first degree. Can it ever be said that where the killing is done "upon a sudden quarrel or heat of passion" that such killing constitutes murder in the first degree?

In considering the evidence the general law relating to proof of deliberation and premeditation must be considered. The burden of establishing these elements

is upon the prosecution unless they may be inferred from the circumstances of the killing. 40 C.J.S., Homicide, § 192, p. 1091:

"The burden is on the prosecution to establish deliberation and premeditation, or premeditated design to kill, under statutes making such elements essential to the crime of murder or of murder in a particular degree, as discussed supra. §§ 15, 30.

"Proof of the mere fact of killing, or of killing with a deadly weapon, does not raise a presumption of premeditation or deliberation, so as to make the offense murder in the first degree under statutes dividing murder into degrees. However, the premeditation or deliberation which is essential for this purpose may be inferred from the facts and circumstances of the killing."

■ Premeditation and deliberation may be proved by circumstantial evidence. 41 C.J.S., Homicide, § 317, p. 30:

"Deliberation and premeditation may be proved by circumstantial evidence, and in a number of cases the evidence has been held sufficient or insufficient to show that accused's acts were done with premeditation or deliberation or both. Threats by accused against the accuser are entitled to some weight in proving premeditation and deliberation, but in determining the weight to be given threats, all the circumstances under which they were made are to be considered. Where provocation intervenes between the threat and the killing, the threat is not conclusive of the fact that killing was done in pursuance thereof, and not on the passion produced by the provocation."

■ Where the evidence creates a reasonable doubt of the guilt of the defendant of first degree murder, he can be convicted only of murder of the second or lesser degree. 41 C.J.S., Homicide, § 328, subsec. b, p. 66. See note 30.

■ It is the universal rule that to sustain a conviction of murder of the first degree all the elements must be proven beyond a reasonable doubt. 41 C.J.S., Homicide, § 328, subsec. c, p. 66:

"In order to support a conviction for murder in the first degree the evidence must be sufficient to establish all the elements of such offense and sufficient to satisfy the jury of the guilt of accused beyond a reasonable doubt. Accordingly, intent to kill, deliberation and premeditation, and commission of, or attempt to commit, another offense when essential elements of murder in the first degree, must be established beyond a reasonable doubt."

\*　　\*　　\*　　\*　　\*　　\*

"A conviction of murder in the first degree may be supported not only by evidence of a direct or positive character, but by evidence wholly circumstantial, provided it is such as to produce on the minds of the jury a conviction of guilt beyond

a reasonable doubt, or is sufficiently cogent to exclude every other reasonable hypothesis except the guilt of accused. Evidence partially or largely circumstantial may, likewise, be sufficient to sustain a conviction for murder in the first degree. Particular circumstantial evidence relied on to support a conviction for murder in the first degree has, however, been held insufficient."

See page 71, 41 C.J.S., Homicide, § 328, cases in note 51, where the courts have held the evidence insufficient to support a conviction for murder in the first degree. Among cases therein cited is People v. Howard, 211 Cal. 322, 295 P. 333, 71 A.L.R. 1385. In this case the court reduced the conviction from first to second degree upon the following circumstances: The defendant and decedent were living together in an apartment, apparently on good terms. About one o'clock in the morning defendant phoned the police station, giving his name, and advising that a murder had been committed in his apartment. Upon the arrival of the police they found the decedent on the edge of his bed in a semi-conscious condition. The room was in a state of disorder, indicating that robbery had been committed. The injured man never was restored to consciousness, and died. A few days later the defendant confessed that he and the decedent had had a quarrel, that decedent grabbed him, and during the struggle defendant struck decedent with a hammer on the head, and that he had disordered the room so as to mislead the police into believing that the decedent had been killed by a robber.

The foregoing is in keeping with the case of People v. Castro, 37 Cal.App.2d 311, 99 P.2d 374, 375. Appellant was charged with the murder of his wife and found guilty of murder in the first degree. The facts were that defendant worked at night-time and returning at one o'clock in the morning found his children in a room, but his wife absent. Later she returned; a quarrel ensued in which the wife cursed the defendant by calling him vile names, got out of her bed where she had gone, and took a knife from her pillow and tried to stab the defendant. A scuffle ensued in which defendant claims deceased struck herself in the stomach during the scuffle, but when he got the knife made a pass with the knife at her but does not claim to know that he cut her, but there were two cuts on the body besides one in the abdomen. From this altercation the wife died. The autopsy showed that the prime cause of death was the stab in the abdomen. Before her death she maintained that it was her husband who stabbed her. The court said:

"While the record reveals that there had been some arguments or quarrels between appellant and decedent, it was shown by the testimony of the landlady of the apartment house where this couple lived that she had never heard them quarrel. Taken as a whole, the evidence presented falls

short of the modicum required for a conviction of murder of the first degree, in that it fails to show that the injuries which decedent suffered were inflicted by appellant 'with that intent or that malice aforethought which is a necessary ingredient of the crime of murder.' People v. Kelley, 208 Cal. 387, 393, 281 P. 609, 611. The attending circumstances neither indicate an abandoned and malignant heart on the part of appellant, nor portray a wilful, deliberate or premeditated killing, but reveal a crime committed 'upon a sudden quarrel or heat of passion,' i. e., voluntary manslaughter."

The cause was remanded to the trial court with directions to enter a judgment against appellant finding him guilty of manslaughter.

In People v. Holt, 1944, 25 Cal.2d 59, 153 P.2d 21, 27, defendant was charged with murder and the jury found him guilty of first degree murder. The facts show that immediately preceding the shooting that decedent advanced toward defendant, coming around the end of a flat car which had been between them, picked up a club, and continued advancing after being told by defendant to stand back; defendant fired one shot into the ground and then as decedent continued to advance, when the distance was about fifteen feet defendant fired again wounding decedent in the abdomen. The facts show that defendant did not attempt to retreat or otherwise decline the encounter. The defendant admitted the killing. The court, among other things, said:

"Here the verdict of guilty of murder of the first degree depends upon proof not only of a malicious intent unlawfully to take life but also that such malicious intent was *willful, deliberate, and premeditated,* and that the homicide was of equal cruelty and aggravation with those enumerated in the statute (Pen.Code, § 189, hereinafter quoted.) As hereinafter discussed more fully, the phrase 'malicious intent' is not synonymous with 'wilful, deliberate, and premeditated' intent. The proof of malicious intent without the further proof that it was 'willful, deliberate, and premeditated' would establish second degree murder but not first degree murder. And since that proof depends at best upon the not infallible processes of reasoning, and is to be derived only by way of inferences from the acts of the defendant and the surrounding circumstances, fairness demands of us, as it did of the jury, that the statements of the defendant and his acts be appraised in the fullest legally available light of all the related facts and circumstances.

"The function of the jury was to appraise the weight of the evidence; ours is to appraise its legal adequacy; and in the performance of these functions the jury could not lawfully, nor may we, disregard certain material facts which are indisputably established by prosecution witnesses."

\* \* \* \* \* \* \*

"Murder, and this, of course, includes murder of the second degree as well as murder of the first degree, is defined as 'the unlawful killing of a human being, with malice aforethought.' (Pen.Code, § 187.) The cognizable and practical differences between murder of the first degree and that of the second degree are difficult to delineate because in all the legal history of California that of the second degree appears never to have been the subject of an authoritative definition that is fully conceptual and substantive.

"The legislative definition of the degrees of murder leaves much to the discretion of the jury in many cases. That discretion, however, must have a sound factual basis for its exercise, as hereinafter is more particularly discussed. The Penal Code section 189 declares that 'All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, is murder of the first degree; and all other kinds of murders are of the second degree.' It is noteworthy that murder perpetrated by gunshot is not, as such, classed as murder in the first degree. It has been held that the existence of a deliberate purpose to kill may be inferred from the character of the weapon used, the circumstances surrounding and showing the relationship of the parties, and the acts and conduct of the accused. (Citing cases). And it has been held that the act of killing may follow the intent to kill as quickly as follow successive thoughts of the mind. (Citing cases)."

"Obviously the homicide in this case was not perpetrated by means of poison, or lying in wait, or torture, nor was it committed in the perpetration of or attempt to perpetrate any of the enumerated felonies. Hence, if it is first degree murder it must come within the classification of 'any other kind of willful, deliberate, and premeditated killing.' But homicide to amount to even second degree murder must be 'the unlawful killing of a human being, with malice aforethought.' The malice which is one of the two essential elements of the offense—whether of the first or of the second degree—is defined by section 188 of the Penal Code. 'Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.'" * * *

"Apparently before the defendant had fully recovered from his intoxication and before Riley had died, the sheriff asked some questions and in reply the defendant said, according to the sheriff's testimony. 'I shot him, because he called me dirty names. * * * He had it coming * * * Sheriff, I would shoot you if you called me dirty names. * * * I didn't want to kill him.

I didn't want to kill anybody. I wouldn't shoot anybody in the back. That would not be sportsmanlike.'"

The evidence in this case disclosed that defendant was an amicable and industrious man when sober, but quarrelsome and irresponsible when he had been drinking. On this occasion he was intoxicated. The cause was remanded to the trial court and modified by reducing it from murder of the first degree to murder of the second degree, which is permitted under the laws of California.

In the case of People v. Bender, 1945, 27 Cal.2d 164, 163 P.2d 8, 11, we think it important to quote first before further referring to the case the expressions of the court at the beginning of its opinion:

"* * * We have concluded that the evidence is sufficient to establish that the homicide was murder but insufficient to establish that such murder was deliberate and premeditated, and that the only prejudicial errors relate solely to the degree of the crime and do not warrant a reversal if the judgment is reduced to an adjudication of murder of the second degree. Therefore, pursuant to the power vested in us by section 1181 of the Penal Code, the judgment should be reduced to impose the penalty prescribed by law for murder of the second degree and, as so modified, affirmed."

The facts of this case are lengthy, but we will relate them briefly. Defendant was known as Richard Bennett. His wife was Rena Bennett. They intermarried September, 1943, and it was thereafter that his wife learned of defendant's first wife, June, and that defendant and his first wife were not divorced. The married life of defendant and Rena was marked by violent quarrels. In March, 1944, defendant was arrested on complaint of his first wife and defendant was confined in the Los Angeles county jail. Rena visited him there. In May, 1944, defendant was released from the jail and returned to the apartment with Rena. On the night of May 15th Rena was killed. The manager of the apartment house where she was living saw her on Friday morning, May 12th, and said she seemed to be in good spirits. About one o'clock Sunday morning, May 14th, one Mrs. Bailey, who lived across the hall from the Bennett's, visited them at Mrs. Bennett's quite emphatic request. Monday morning May 15th, defendant left the apartment. The manager of the apartment was in the Bennett apartment a few minutes each day from May 16th through May 19th. On Tuesday, the 16th, she noticed nothing unusual. The apartment was in perfect order. On Wednesday, the 17th, the maid pulled down the in-a-door bed and found blood stains on the bedding. On the floor of the closet adjoining the bed was a large bundle on which suit cases and a lamp were piled. The maid did not clean the apartment or change the bed. On Wednesday evening the manager saw a note propped upon the table in the apartment. This note was from defendant to Rena dated May 16th. On Friday afternoon the

police were called and found that the bundle in the closet contained Rena's body. There were two ragged lacerations on the front of her head, abrasions on the cheek and bruised areas on the forehead, marks on the neck, the condition of the deep tissues of the neck and the condition of the lungs indicated strangulation which contributed to cause death. The immediate cause of death was head injury.

On Tuesday, May 16th, defendant, under assumed name, registered at a Los Angeles hotel. He checked out May 22nd. On May 24th police found him lying in a penthouse storeroom on the roof of the hotel.

"* * * He 'seemed to be in a dazed condition.' His clothing and the sheet on which he lay were bloodstained. On each forearm were superficial cuts which 'appeared suicidal in type.' Strapped to one wrist were letters signed by the defendant. One letter was addressed to the Los Angeles Police Department, dated May 15th, and reads in part, 'I am taking my own life. * * * My wife admitted to me last evening that she was untrue to me * * * I'm too hurt by her infidelity to write her. * * * I shall die only for her sake. Hope my death will make a better woman of Rena.'

"June (the first wife) received a letter from defendant dated Tuesday, May 16th, which reads in part: 'You are primarily responsible for my death. As I know Rena would not have done what she did if you had not lied to her. She went completely haywire and I know they will blame me for her death. I came home this morning at 5 a.m. and found her dead. I don't know who killed her, but wish I did before I join her in death. * * * I am going to jump off this roof. * * * I was too panicky to let Rena be as I found her. * * * I had (sic) her in the closet, hoping to gain time to settle all my affairs. * * * Whoever killed her had a good cause, for I know she did me dirt, but now I can only think of her in her goodness.' "

Defendant testified that when he called her a "common whore" she struck him on the side of the face "and I must have struck her, because even after that she started crying and I felt sorry and we got up and we had some more to drink." But deceased told defendant during their altercations to go outside and take a walk. When he returned he found deceased lying across the bed. He asked her "What in hell are you doing on the foot of the bed?" and he stated that he put the floor lamp on and then discovered the body.

The facts indicate that the death occurred during the series of quarrels in the early morning of May 15th. At the trial of defendant the jury found him guilty of murder in the first degree. The opinion further states:

"The adjective 'deliberate' means 'formed, arrived at, or determined upon as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan;

82

carried on cooly and steadily, esp. according to a preconceived design; * * * Given to weighing facts and arguments with a view to a choice or decision; careful in considering the consequences of a step; * * * unhurried; * * * Characterized by reflection; dispassionate; not rash.' (Webster's New Int. Dict., 2d Ed.) The word is an antonym of 'Hasty, impetuous, rash, impulsive.' (Id.) It has been judicially declared that 'Deliberation means careful consideration and examination of the reasons for and against a choice or measure.' People v. Richards, 1905, 1 Cal.App. 566, 571, 82 P. 691, 693. The verb 'premeditate' means 'To think on, and revolve in the mind, beforehand; to contrive and design previously.' (Webster's New Int. Dict. (2d ed.) .)."

* * * * * *

"The words 'deliberate' and 'premeditate,' as above shown, have clearly defined and commonly understood meanings. In view of such commonly understood meanings it might not be necessary, at least in the absence of a request therefor, for the trial court to instruct the jury at all on the significations of those words, but when it does undertake to define or describe their significativeness any definition or description given should be fair and complete. For example, the jury may be told that 'Neither the statute nor the court undertakes to measure in units of time the length of the period during which the thought must be pondered before it can

ripen into an intent which is truly deliberate and premeditated. The time would vary with different individuals and under differing circumstances. The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides (not specifically enumerated in the statute) which are the result of mere unconsidered or rash impulse hastily executed.' People v. Thomas, 1945, supra, page 900 of 25 Cal.2d, page 18 of 156 P.2d. But if they are instructed in that vein, which emphasizes the rapidity with which thoughts may follow each other, fairness requires a further instruction placing at least equal emphasis on the true (see definitions above) meaning of the terms. In other words, while the jury may be told that the brain can function rapidly they must not be misled into thinking that an act can at the same time be hasty, hurried, and deliberate or impulsive, unstudied, and premeditated. The extent of the reflection in every case, if it is to pass the test, must fairly and reasonably meet the ordinary and unquestioned significations of the test words.

"It is irrefragable that (in cases of the type now before us) the statutes of California purport to authorize putting a person to his death only where his act of kill-

ing was truly deliberate and premeditated; i. e., was murder of the first degree. If we were to uphold a finding of first-degree murder, and consequentially imposition of the death penalty, in cases where (as here) the jury have been authorized to believe that neither deliberation nor premeditation, in any commonly understood meaning of those words, need be shown, we should gravely augment the applications of that penalty. Executions in such cases would be by authority of law only because we so held—not because the language of the statute upon any meaning defined either in the statute or in any standard dictionary so provided. Although, as pointed out in People v. Holt, 1944, supra, 25 Cal.2d 59, 84–89, 153 P.2d 21, 34–37, there have been inconsistencies in the interpretations and applications of the statute sufficient to establish precedents for varying views, we deem it preeminently our duty not to seek to extend the statute but rather to understand it and give it effect as written by the Legislature."

The testimony in this case does not support the conviction of the defendant of the crime of murder of the first degree. No sufficient showing has been made to make this killing one of deliberation and premeditation which called for the conviction of the defendant of murder in the first degree and the fixing of the death penalty.

In view of our disposition of the case we do not think it necessary to pass on the other assignments of error.

Judgment is reversed and case remanded for new trial.

LA PRADE and MORGAN, JJ., concur.