[Crim. No. 5913.   In Bank.   Nov. 30, 1956.]

THE PEOPLE, Respondent, v. WILLIAM BRIDGEHOUSE, Appellant.

Eugene V. McPherson and Gladys Towles Root for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

CARTER, J.—Defendant, William Bridgehouse was convicted, after trial by jury, of second degree murder of William Bahr. His plea of not guilty by reason of insanity was tried, by stipulation, by the court and he was adjudged sane both presently and at the time of the commission of the crime. The appeal is from the judgment of conviction and the denial of his motion for a new trial.

Defendant who was 31 years of age, married Marylou Bridgehouse in 1951. At the time of the crime, they had a son, Danny, who was 2½ years old. Mrs. Bridgehouse had a son by a prior marriage who, at the time of the crime, was 6½ years of age. At some time early in 1954, defendant met the deceased who was a part time bartender as well as a commercial fisherman and an engineer on construction work. Mrs. Bridgehouse had known Bahr for more than six years. After defendant met Bahr, he and his wife had discussed her relations with him for a period of "well over a year." Mrs. Bridgehouse told defendant that she was having a love affair

with Bahr and that she had stayed all night with him. For some six or seven months prior to the crime, defendant had worked at two jobs—from 3:30 p. m. until 11:30 p. m. he worked at the Los Angeles county sheriff's department as a deputy sheriff; and from midnight until 7 in the morning, he worked at Air Research Manufacturing Company where he had been employed for some six or seven years. During the time he was working nights, Mrs. Bridgehouse told him that she was seeing Bahr at the family home, and other places. When defendant took the night position he had moved into a room in Los Angeles, returning to his home in San Pedro on his days off. The record shows that Mrs. Bridgehouse left the children at home alone, or that she took them with her to the bar where Bahr worked. There is testimony by defendant's neighbors that Bahr's car was often seen standing all night, or the major portion thereof, in front of the Bridgehouse home.

The defendant filed a suit for divorce from his wife in October, 1954. On January 4, 1955, he filed an application for a restraining order prohibiting Mrs. Bridgehouse from associating with, or cohabiting with Bahr in the presence of the parties' minor child. This was served on Mrs. Bridgehouse on January 7th. About January 7th, defendant resigned from the sheriff's department. On the same day he got his gun, which he had bought as a service weapon while with the sheriff's department, out of hock and loaded it in the pawn shop with the intention of selling it. On January 7th, after having been served with the restraining order, Mrs. Bridgehouse telephoned defendant asking him to see her in San Pedro. Defendant went to San Pedro, arriving there at approximately 10 o'clock on the morning of the 8th. When he reached the family home, he slept for a couple of hours. When he awoke, Mrs. Bridgehouse told him that she would fight his divorce action and would not hesitate to lie or use any other methods in so doing; that she would kill him if he tried to take the children away from her. During this discussion, defendant apparently gave his wife, at her request, two or three months to think things over and decide whether or not she wanted him or Bahr. After this discussion, defendant left the house and went to Manhattan Beach returning to his wife's home between 7 and 8 o'clock in the evening. Mrs. Bridgehouse was not there at the time but returned with the children sometime after 9 p. m. Defendant spent the night there, and the next morning Mrs. Bridgehouse at de-

fendant's request finally consented to arrange a meeting between defendant and Bahr but would not agree to a time and place, and in answer to defendant's questions as to Bahr's whereabouts, told defendant she did not know where Bahr was.

The defendant and the parties' small son left the house. He intended to go to his room in Los Angeles and clean up and, after finding some socks for the boy, take a trip to the zoo. The defendant, prior to leaving the home in San Pedro, took his gun, which was on a shelf there, and put it in his belt. He went to his wife's mother's home in San Pedro where his wife had told him he could find some socks for the child. When the door was opened to him by his wife's grandmother, he went to his mother-in-law's bedroom where he was told by her that the socks were either in the pantry or hanging on the line. As he returned from the clothesline with the socks, he passed the den where he saw Bahr sitting on the davenport reading. Bahr was living there at the time. At this point, Mrs. Jennings, the grandmother, said that the child was getting out of the car, so defendant went through the front door of the house and put him back into the car. Upon defendant's return to the house, he was informed that the child was again getting out of the car. Defendant then went after the child and brought him in the house. His mother-in-law told him when he came in the bedroom, "Bill, you look white and shaking. I have something that I think will calm you down. Something the doctor gave me and I . . .." After this statement, Mrs. Huff went into the kitchen to get the defendant a glass of water and as she returned she heard the shots; that she thought there were five or six of them; that the defendant was firing them; that he was standing in front of Bahr who was standing in front of the sofa; that he started falling before the "end of the shots"; that she saw Bahr fall over the coffee table; that she ran and got the child and went to her bedroom where she sat, holding him. She testified that prior to going to the kitchen for the water she heard either defendant, or Bahr, say "Hi, Bill."

Defendant testified that he had purchased the gun as his "service weapon" for his work in the sheriff's department where it was required; that after getting it out of the pawn shop he had placed it on a top shelf in the San Pedro home; that when he left his wife's home he stuck it in his belt where it remained while he went into the Huff house; that he did

not want to leave it in the car because of the child; that it would not fit in the glove compartment. He testified that when he went to the Huff house he was "Tired. Physically tired. Perhaps to the point of exhaustion." He said his mother-in-law said he looked as if he had been working too hard and that he was shaking and she would get him something. He said that he then walked over to where Bahr was sitting and that "It is very hazy, but I believe I spoke to him, and it is my recollection that at that time that I wanted to discuss my legal—— the legal action that I was taking against him, and that I wanted to get it over with and get it out of my system and talk it out with him"; that he had no idea where Bahr was or that he was there until he saw him; that he seemed "to have a very vague memory of him springing from the couch"; that "As near as I can possibly reconstruct in my mind, the next thing I remember was pulling the trigger on empty cartridges"; that "The whole action was of such an explosive nature, you might say, and so distorted by a haze of mental void, you might say, that a detailed remembrance of the whole action are very——"; that he believed he next walked into the kitchen, but didn't know how much later it was; that while being questioned by the officers "It is very difficult to recall. All I knew was that I was in considerable pain at the time. I had a great deal of difficulty in replying to the questions . . . as I remember, it [the pain] was in the region of the solar plexus or in the thoracic or chest region"; that he had never had any pains like that before; that many times in the past he had been so fatigued he had not been able to speak rationally. The officer who questioned him after the crime was committed, said he found defendant sitting at the kitchen table with his head in his hands; that he seemed to be in pain and upset; that he had difficulty in speaking and that his voice seemed to come in sort of a "gasp." Shortly after the crime, the defendant made the following statement to a police officer: "About this time I thought that I would tell Mr. Bahr what I wanted to tell him for a long time, that I didn't want him around my children, and I was really going to tell him off. I went out of the bedroom [belonging to Mrs. Huff] and across the living room to where Mr. Bahr was sitting on the divan. He looked up or started to stand up. I really don't remember what. As I stood in front of him, there was a table between us. I don't remember if I said anything or not before taking the gun out of my belt and shooting. I don't actually recall

pulling the trigger. All I remember is that I realized my gun was clicking on empties.''

The defendant's testimony showed that his mother had been committed to Camarillo State Hospital; that he still loved his wife and wanted her to give up Bahr and live with him and the children and that he thought the complaint for divorce and the order to show cause might force her to choose him and leave Bahr. The record also showed that defendant's wife and Bahr had a joint bank account which was known to defendant; that one of defendant's charge accounts had been used to buy a gift for Bahr; that defendant had found Bahr's clothing hanging in the closets of his home; that he had paid the entire support of his wife's son by her former marriage; that he thought of the child as his own son and treated him in the same way as he did his own son; that the child thought he was his father and called him ''Daddy.'' He testified that he resigned his job in the sheriff's department because he felt the position was ''detrimental to my family, and secondarily very detrimental to my health'' since he was worn out physically; that he had tried many times to get Mrs. Bridgehouse to go to a marriage counselor in order to work out their difficulties. He testified that his wife had had a very unhappy childhood and unfortunate first marriage and that her emotional disturbances were caused thereby; that she didn't seem to want to lose him, nor did she want to give up Bahr. When defendant was asked what his feeling was concerning Bahr, he answered: ''I tried very much to make a non-entity out of him in my own mind, in my mind's eye. I knew from various sources that he was not the kind of person whom I could consider an upright, solid citizen. I knew that you can't force an adult to do something or not to do something against their will. I had to leave the decision up to Mary, and, yet, as I say, I also had my duty and my sacred oath [his marriage vows] and my regard for my children to consider.''

During the trial defendant was asked what his emotions were when he saw Bahr in his mother-in-law's home. He said: ''It is a very difficult thing to describe. I recall trying to discuss it. I believe it was with Officer Butts during one of our interrogations. It was a feeling of great shock. He was living in my mother's house, or in my mother-in-law's house or that she was virtually acting as a panderer you might say, and that the dreadful situation had gone as far as it had.'' He also said that his pallor and shakiness might have come

from the shock he sustained at finding Bahr living in Mrs. Huff's home. He testified that he really didn't believe he resented Bahr or felt angry toward him. He also testified that on the morning of the Sunday in question, he had asked his wife to go skiing with him, but that she had refused, saying she was going fishing with her mother and that probably Bahr would be along later.

There is very little discrepancy between defendant's three statements to police officers and his testimony while on the stand. In all statements, as well as in his testimony, he stated that he did not remember what he had done with the gun after the shooting. Perhaps the only real difference is in a statement signed by him and prepared from a series of questions and answers in which he said that he had not taken time to aim but had just kept on shooting, while in another statement, and in his testimony, he said he remembered only the trigger clicking on empty cartridges. He also testified that he did not actually remember pulling the gun from his belt; that he was not conscious at any time of any bullets exploding. During defendant's testimony he repeatedly stated that he was not sure what he actually remembered as having taken place in Mrs. Huff's home on the day of the crime and what he had decided must have taken place from questions asked of him and statements made to him. He stated at the trial that he had no actual recollection of reading the statements attributed to him before signing the paper.

There is no evidence in the record that defendant ever made any threatening remarks to, or about Bahr, or even any remarks showing resentment toward Bahr because of his love affair with Marylou Bridgehouse. All the evidence in the record shows that defendant's reputation for peace and quiet both at work and in the neighborhoods in which the parties had lived was "very good" and "extremely good"; that he was a good father and loved his children, took care of them, and played with them whenever he had an opportunity.

Defendant's contentions are that the evidence is insufficient to sustain the judgment and that it was prejudicial error for the trial court to refuse to give his requested instruction on the legal effect of unconsciousness. (Pen. Code, § 26, subd. 5.)*

---

*"§ 26. [Who are capable of committing crimes.] All persons are capable of committing crimes except those belonging to the following classes: . . .

"Five. Persons who committed the act charged without being conscious thereof. . . ."

We are of the opinion that defendant's contention that the evidence is insufficient to sustain the judgment of second degree murder is meritorious and that the evidence, as a matter of law, shows that the defendant was guilty, at most, of voluntary manslaughter. ▓ Voluntary manslaughter is a wilful act, characterized by the presence of an intent to kill engendered by sufficient provocation and by the absence of premeditation, deliberation and (by presumption of law) malice aforethought. Penal Code, section 192, subdivision 1, defines voluntary manslaughter as the unlawful killing of a human being, without malice "upon a sudden quarrel or heat of passion." ▓ To be sufficient to reduce a homicide to manslaughter, the heat of passion must be such as would naturally be aroused in the mind of an ordinary, reasonable person, under the given facts and circumstances, or in the mind of a person of ordinary self-control. (*People* v. *Valentine*, 28 Cal.2d 121 [169 P.2d 1]; *People* v. *Danielly*, 33 Cal. 2d 362 [202 P.2d 18].) ▓ The evidence here shows, without conflict, that defendant's wife was having an affair which had extended over a considerable period of time with the deceased; that she would neither approve of the defendant commencing an action for divorce nor would she forego seeing the victim of the crime; that the sight of the victim in his mother-in-law's home was a great shock to the defendant who had not expected to see him there or anywhere else. This court said in *People* v. *Kelley*, 208 Cal. 387, 393 [281 P. 609], in reducing the degree from first degree murder to manslaughter, "That a crime was committed, and that the appellant committed it, are firmly established by this record. We have therefore concerned ourselves with the degree or the extent of the crime which was committed. The injuries inflicted on Mrs. Mellus, and from the effect of which she died, were disgusting, bestial and shocking. But there is nothing in the record from which it may with reason be argued that they were inflicted with that intent or that malice aforethought which is a necessary ingredient of the crime of murder. Nor can we bring ourselves to believe that there was a wilful, deliberate and premeditated killing. The prosecution, the defense, and all others connected with the cause are so familiar with the crime that an analysis of the evidence seems unnecessary. No express malice was shown, for there was not manifested a deliberate, or any, intention to unlawfully take the life of a fellow creature, and the circumstances attending the killing in this case, as proved,

do not show an abandoned and malignant heart.'' In the case at bar, there was no malice shown, either express or implied; there was no showing of any premeditation, either express or implied; there was no evidence of an ''abandoned and malignant heart.'' There was ample, uncontradicted, evidence that defendant was a man of excellent character; that he was mentally and emotionally exhausted and was white and shaking. It appears to us, as a matter of law, that under the circumstances here presented there was adequate provocation to provoke in the reasonable man such a heat of passion as would render an ordinary man of average disposition likely to act rashly or without due deliberation and reflection (*People* v. *Logan,* 175 Cal. 45, 49 [164 P. 1121]).

We are not unaware of defendant's second contention that although he offered four instructions on the legal effect of unconsciousness* which he relied upon as a defense no such instruction was given. An instruction on that subject should have been given. As this court said in *People* v. *Kelley,* *supra,* ''Were we compelled, as formerly, to either affirm the judgment or reverse the case, we would be driven to the latter course'' because of this prejudicial error. However, we have concluded that we must exercise the power conferred upon us by section 1181 of the Penal Code and reduce the degree of the crime from second degree murder to that of manslaughter (*People* v. *Kelley, supra*; *People* v. *Howard,* 211 Cal. 322 [295 P. 333, 71 A.L.R. 1385]; *People* v. *La Fleur,* 42 Cal. App.2d 50 [108 P.2d 99]; *People* v. *Castro,* 37 Cal.App.2d 311 [99 P.2d 374]; *People* v. *Slater,* 60 Cal.App.2d 358 [140 P.2d 846]; *People* v. *Daniel,* 65 Cal.App.2d 622 [151 P.2d 275]; *People* v. *Ross,* 34 Cal.App.2d 574 [93 P.2d 1019]; *People* v. *Moreno,* 6 Cal.2d 480 [58 P.2d 629]; *People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21]; *People* v. *Tubby,* 34 Cal.2d 72 [207 P.2d 51]).

We conclude, therefore, that the evidence is legally insufficient to support a judgment of second degree murder but that it is legally sufficient to support a judgment of manslaughter.

The judgment of the trial court of second degree murder is modified and the cause remanded to the trial court with directions to enter judgment against defendant finding him guilty of manslaughter and thereupon to pronounce judgment upon him as prescribed by law.

Gibson, C. J., Traynor, J., and Schauer, J., concurred.

---

*Penal Code, section 26, subdivision 5.

SPENCE, J.—I dissent.

The majority concludes that the offense should be reduced from second degree murder to manslaughter upon the authority of *People* v. *Kelley*, 208 Cal. 387 [281 P. 609].) The cited case is clearly distinguishable. From the summary of the testimony in the majority opinion, it appears that there was ample evidence here from which the jury could infer that defendant had a definite motive for killing his victim, that he had deliberately made preparation for such killing, and that the killing was thereafter accomplished with "malice aforethought" and at the first opportunity. (Pen. Code, § 187.) There was no comparable evidence in the Kelley case to support any one of the above-mentioned inferences. I am therefore of the view that the Kelley case is not controlling, and that the evidence in this case is sufficient to sustain the conviction of second degree murder. (Pen. Code, §§ 187, 189.) In fact, said evidence appears to be sufficient to sustain an inference that defendant's act constituted a "willful, deliberate, and premeditated killing," but these elements are only required in sustaining a conviction of first degree as distinguished from second degree murder. (Pen. Code, § 189.)

With respect to the alleged error in the failure of the trial court to give an instruction, I find no evidence to support the theory that defendant was unconscious at the time of the killing. Defendant was asked: "You believe that in your condition, as you were that Sunday morning, that you were capable of thinking correctly and rationally?" He testified in reply: "I thought so at the time. I rather doubt it now." While defendant professed at the trial to be somewhat hazy in his recollection concerning the events of the morning of the killing, he did not testify at any time that he was unconscious at the time of the killing. If, however, there could be found any basis for the majority's conclusion that the evidence was such as to require an instruction on the subject of unconsciousness, then the majority should reverse rather than reduce the crime to manslaughter, as a person who does an act "without being conscious thereof" does not commit voluntary manslaughter or any other crime by the doing of such act. (Pen. Code, § 26, subd. 5.)

I would affirm the judgment and the order denying a new trial.

Shenk, J., and McComb, J., concurred.